**Nassar AFSHAR, Appellant,**

v.

**DEPARTMENT OF STATE, et al.**

No. 81–1299.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 22, 1982.

Decided March 15, 1983.

---

Susan W. Shaffer, Washington, D.C., with whom Mark H. Lynch, Washington, D.C., was on the brief, for appellant.

Alfred Mollin, Atty., Dept. of Justice, Washington, D.C., with whom Charles F.C. Ruff, U.S. Atty., Washington, D.C., at the time of oral argument, and Leonard Schaitman and Marc Johnston, Attys., Dept. of Justice, Washington, D.C., were on the brief, for appellees; Lee S. Strickland, Atty., C.I.A., Arlington, Va., also entered an appearance for appellee.

Before ROBINSON, Chief Judge, DAVIS *, Circuit Judge for the United States Court of Appeals for the Federal Circuit, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge McGOWAN.

McGOWAN, Senior Circuit Judge:

In this appeal arising under the Freedom of Information Act ("FOIA" or "the Act"), the appellant raises four substantive issues: (1) whether the Act allows the government agencies herein to withhold information under exemptions 1 and 3 where there have been prior disclosures of similar information; (2) whether the information withheld under exemption 1 was properly classified in light of the agencies' failure to balance the public interest in disclosure against the government's need for secrecy; (3) whether information can be withheld under exemption 3 of the Act if it is not properly classified under exemption 1; and (4) whether certain memoranda recommending agency action can be withheld under exemption 5 of the Act if the recommendations were actually adopted as the basis for agency action.

* Sitting by designation pursuant to 28 U.S.C. § 291(a).

The District Court, granting the defendant appellees' motion for summary judgment, ruled in the affirmative on all four issues. We affirm as to the first, vacate the District Court's ruling on the second as moot in light of the issuance of a new Executive Order governing classification, decline to reach the third because of our decisions on the first and second, and reverse as to the fourth. We also reject plaintiff's contention of reversible procedural error in the court below, but remand for further factfinding as to six deletions with regard to which the government admits error and as to the two portions of documents withheld under exemption 5.

I

Nassar Afshar is an Iranian-born United States citizen who was, when this action began, editor of the *Iran Free Press,* a newspaper published in Washington, D.C., and chairman of the Committee for Free Iran, which published the newspaper. Afshar was a prominent critic of the former Shah of Iran.[1] On March 27, 1975, Afshar submitted requests under the Freedom of Information Act, 5 U.S.C. § 552, to the Department of State, the CIA, and the Department of Justice for all documents generated since January 1970 pertaining to him or his activities on the newspaper or the Committee. The agencies released a total of thirty documents, some with deletions, and withheld a number of others. J.A. 13–17. Afshar restated his requests through counsel in May 1976, expanding them to include pre-1970 documents. On July 30, 1976, after the agencies had failed satisfactorily to respond to his renewed requests and appeals therefrom, Afshar filed the present action.[2]

Ultimately, the State Department, CIA, and FBI located numerous other documents within the scope of Afshar's requests and released many of them, some with deletions. The agencies withheld a number of others, claiming a variety of exemptions from the Freedom of Information Act's mandatory disclosure provisions. Pursuant to *Vaughn v. Rosen,* 484 F.2d 820, 827–28 (D.C.Cir. 1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974), the agencies produced indices in which each deletion or withholding was placed into a category of information; the withholding of each category of information was justified in accompanying affidavits. At issue in this appeal are deletions in or withholding of eighty-six documents that fall into eight categories as to which the government claims exemptions 1, 3, or 5 of the Act, 5 U.S.C. § 552(b)(1), (3), (5). *See* Brief for Plaintiff-Appellant at 6–9.[3]

The defendants subsequently filed a motion for summary judgment in the District

---

**1.** According to a 1979 article in the *Washington Post* that is included in the record in this case, a classified study by the staff of the Senate Foreign Relations Committee's subcommittee on international operations revealed that the Iranian intelligence agency SAVAK had targeted Afshar for assassination, and that the Central Intelligence Agency (CIA) had previously passed to SAVAK some of the information it had received on Afshar from the Federal Bureau of Investigation (FBI). *Foreign Spy Activities Found Rampant in U.S.,* Wash. Post, Aug. 9, 1979, at A1, col. 1, A12, col. 1, *reprinted in* Joint Appendix (J.A.) 276, 278; *see also The Iranians,* Wash. Post, Aug. 9, 1979, at A12, col. 3, *reprinted in* J.A. 280 (would-be assassin defected from SAVAK). In his administrative appeals in this case, Afshar described two alleged attempts to kidnap him in 1973 and 1974 and claimed that United States agencies "may have been involved or knowledgeable in them." J.A. 52, 59.

**2.** In his complaint Afshar sought disclosure of documents in the possession of the Justice Department generally, and of the National Security Agency and the Defense Intelligence Agency, to which the CIA had referred some documents. On appeal, he no longer seeks documents from either of the two agencies or from divisions of the Justice Department other than the FBI. Brief for Plaintiff-Appellant at 5 nn. * & **.

**3.** The government failed to file affidavits as to one category of information, labeled L, withheld by the CIA. That category consists of information deleted from CIA documents pursuant to determinations of other United States government agencies. Portions of six documents are contained in this category. *See* Brief for Plaintiff-Appellant at 7 n. ***. As to these documents we remand for the descriptions and justifications required by *Vaughn.* The government has no objection to this remand. Brief for the Appellees at 4 n. 1, 51 n. 16.

Court. After a hearing on the motion, the court on October 24, 1980, granted summary judgment for defendants on all issues. J.A. 283. The court ruled that the information withheld under exemption 1 was properly classified and that publicly circulating reports or information "cannot be given any degree of import they do not now possess through the vehicle of official executive disclosure." J.A. 285–86. The court emphasized the "extreme sensitivity of relations between the present government of Iran and the United States," and the independent need not to jeopardize the confidence of other governments about this nation's ability to keep secrets. *See* J.A. 286–87. It found that the balancing provision of the relevant Executive Order was "simply a statement of the authority of designated Executive Branch officials, under circumstances to be determined by them, to effect an authorized disclosure of information that would otherwise maintain its classified status." J.A. 290. The exercise of this authority, the court held, is left to the unreviewable discretion of the Executive. J.A. 290–91. Finally, the court held that exemptions 1 and 3 are "independent exemptions," J.A. 291, and that release of the information withheld under exemption 5 "would reveal executive, predecisional advisory communications which would serve to injure the consultative functions of government," J.A. 287. Plaintiff's motion for reconsideration was denied, and he appealed to this court.

## II

Plaintiff's substantive arguments are aimed at obtaining not immediate release of the disputed documents but rather a remand so that the government may provide a more particularized showing that the information is in fact exempt from FOIA. We consider each of plaintiff's arguments below in the order they are raised in the briefs.

### A. *Prior Release of Similar Information*

Plaintiff objects to the withholding of certain information under exemptions 1 and 3 of the Act, because information fitting the defendants' descriptions of the withheld information has already been released to the public.

Exemption 1 exempts information that is "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) [is] in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). At the time the government reviewed the information here, the relevant Executive Order was E.O. 12,065, 3 C.F.R. 190 (1979) (revoked 1982). That Order provided, *inter alia,* that certain categories of information could be classified if unauthorized disclosure of the information "reasonably could be expected to cause at least identifiable damage to the national security." *Id.* § 1–302, 3 C.F.R. at 193.[4]

Exemption 3 excludes from FOIA matters that are specifically exempted from disclosure by certain statutes. 5 U.S.C. § 552(b)(3).[5] In this case, the government claims that 50 U.S.C. § 403(d)(3) authorizes the withholding of the information at issue. That section provides, *inter alia,* that "the

---

4. While this appeal was pending, President Reagan revoked E.O. 12,065 and replaced it with E.O. 12,356, 47 Fed.Reg. 14,874 (1982) (effective Aug. 1, 1982). The new Order supplements the categories of information that may be classified with several new ones, *id.* § 1.3(a), 47 Fed.Reg. at 14,876, and deletes the requirement of "identifiable damage" to national security. It provides that the information may be classified if its unauthorized disclosure "reasonably could be expected to cause damage to the national security." *Id.* § 1.3(b), 47 Fed.Reg. at 14,876. These changes, which generally tend to increase the amount of classifia-

ble material, do not affect our disposition here. The new Order does affect the result in part II(B) *infra,* however.

5. Exemption 3 exempts matters that are
 specifically exempted from disclosure by statute ..., provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld.
 5 U.S.C. § 552(b)(3).

Director of Central Intelligence shall be responsible for protecting intelligence sources and methods from unauthorized disclosure." Exemption 3 is claimed only by the CIA, and by the FBI as to information supplied to it by the CIA.

The logic of plaintiff's argument is that release of information cannot be expected to cause damage to the national security or disclose intelligence sources and methods if the information is already publicly known. Since it is impossible to tell from the government's affidavits how the information withheld here is different from that already released, the argument goes, the government should be compelled to show how the withheld information is both different from and more sensitive than the information already released. See Brief for Plaintiff-Appellant at 16; Reply Brief for Plaintiff-Appellant at 4.

A number of courts have shown a willingness to accept the argument that publicly known information cannot be withheld under exemptions 1 and 3. See, e.g., Founding Church of Scientology v. NSA, 610 F.2d 824, 831–32 (D.C.Cir.1979) (suppression of "well publicized" information would frustrate policies of Act without advancing countervailing interests); Lamont v. Department of Justice, 475 F.Supp. 761, 772 (S.D.N.Y.1979) (Weinfeld, J.) (the "sunshine" purposes of FOIA would be thwarted if information remained classified after it had been "specifically revealed to the public"); see also Military Audit Project v. Casey, 656 F.2d 724, 741–45 (D.C.Cir.1981) (concluding that precise information withheld had not been previously revealed).

These courts have made clear that, while it is generally true that the government bears the burden of proving that its withholding of information is justified by one or more of the Act's exemptions, 5 U.S.C. § 552(a)(4)(B), a plaintiff asserting a claim of prior disclosure must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld. See, e.g., Military Audit Project, 656 F.2d at 741–45 (discussing only the publications cited by plaintiffs); Lamont, 475 F.Supp. at 772 & n. 43 (otherwise government's task would be "virtually limitless").

While courts have recognized the logic of plaintiff's argument, however, FOIA requesters in plaintiff's position face substantial practical difficulties in using it to force the government to release further information. The Freedom of Information Act bars the courts from prying loose from the government even the smallest bit of information that is properly classified or would disclose intelligence sources or methods. In many cases, the very fact that a known datum appears in a certain context or with a certain frequency may itself be information that the government is entitled to withhold. For example, even if the CIA at one time acknowledged the existence of an intelligence relationship with SAVAK, which is information that fits into one of the categories of information withheld in this lawsuit,[6] the release of a series of telegrams and cables recording particular contacts in the relationship might well provide new information regarding the extent and nature of the liaison. This too may be information that the agency may safeguard.

Also, even if a fact—such as the existence of such a liaison—is the subject of widespread media and public speculation, its official acknowledgment by an authoritative source might well be new information that could cause damage to the national security. Unofficial leaks and public surmise can of-

---

**6.** The CIA has withheld information that was "supplied by a foreign intelligence service or [that] reveal[s] the existence of and details concerning a specific intelligence relationship with a foreign intelligence service." J.A. 73. Such information is contained in CIA categories A and B. Plaintiff now seeks only documents regarding the CIA's relationship with SAVAK. Brief for Plaintiff-Appellant at 7–8.

The agency claims exemptions 1 and 3 as to this material, asserting that such intelligence relationships are conducted on the understanding of absolute confidentiality, so that their official acknowledgment would jeopardize all existing and future cooperative relationships and would strain or disrupt United States relations with other countries. J.A. 73–75.

ten be ignored by foreign governments that might perceive themselves to be harmed by disclosure of their cooperation with the CIA, but official acknowledgment may force a government to retaliate. *See Phillippi v. CIA,* 655 F.2d 1325, 1332–33 (D.C. Cir.1981) ("In the world of international diplomacy, where face-saving may often be as important as substance, official confirmation ... could have an adverse effect on our relations [with other countries]."); *see also Military Audit Project,* 656 F.2d at 743–45 (lack of authoritative acknowledgment can leave foreign intelligence services guessing as to whether information is true).[7]

A further hurdle for plaintiffs like Mr. Afshar is the fact that courts will be sensitive to the occasional difficulty of distinguishing with any great particularity, but without revealing the matter sought to be kept secret, releasable documents from those that must be withheld. For example, the category of information labeled State Department category A consists in part of confidential and candid assessments by U.S. officials of the views of senior Iranian officials concerning the effect of plaintiff's publishing activities on U.S.-Iran relations. J.A. 222.[8] Clearly some U.S. assessments or Iranian views are more "candid"—and

therefore more needful of secrecy—than others, yet it may be very difficult to tell why without discussing their subject matter. In these circumstances, unless it senses bad faith or a general sloppiness in the declassification or review process, a court will feel with special urgency the need to "accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record," S.Rep. No. 1200, 93d Cong., 2d Sess. 12 (1974) (conference report), U.S.Code Cong. & Admin. News 1974, pp. 6267, 6290. *See generally Salisbury v. United States,* 690 F.2d 966, 971 (D.C.Cir.1982) (limited prior disclosures do not require remand owing in part to court's desire "to avoid discouraging the agency from disclosing such information about its intelligence function as it feels it can without endangering its performance of that function").

■ Plaintiff's attempt to show prior release of the information withheld here falters in the face of all these problems. He does not succeed in raising such questions about the *bona fides* or diligence of the agencies as to override the weight we must give to their classification decisions. In every case we are able to tell from the affidavits already submitted by the government

---

**7.** *Phillippi* cites the example of Khrushchev's cancellation of the Paris summit meeting with President Eisenhower after the Soviet downing of an American U–2 reconnaissance plane in 1960. Khrushchev reportedly said later that what led him to take the action "was not the fact that American U–2's had overflown the Soviet Union—that was not news to Khrushchev—but rather that President Eisenhower had publicly admitted that he had approved the mission." 655 F.2d at 1332.

In the CIA's affidavit justifying the withholding of category A and B documents, *see supra* note 6, the agency states that "most governments do not officially acknowledge the existence of their intelligence services," and that while intelligence liaison arrangements of this nature may be widely reported in the media, "they are not officially acknowledged, since the government adversely affected would be forced to take some official action in retaliation." J.A. 74.

**8.** According to the State Department affidavits, category A consists of part or all of three documents. The withheld portions either

a) discuss confidentially candid U.S. Embassy views about senior Iranian Government officials or the confidentially expressed views of such officials concerning developments in U.S.-Iran relations as affected by Nasser Afshar's publication activities in this country (documents 2, 28, 30); or b) discuss confidentially the Department's perception of Iran's relations with a third country (document 2). J.A. 222. The Iranian officials mentioned evidently wished to remain anonymous. J.A. 223.

The State Department claimed in an affidavit dated January 25, 1979, that release of category A information would "significantly damage[ ]" its ability "to properly manage our evolving relations with Iran," in view of the shifting situation in that country. J.A. 222. It also asserted that it had "an on-going vital national security interest in maintaining the unquestioned confidence of all foreign governments ... in the Department's ability to strictly protect foreign government information conveyed to it confidentially." J.A. 223.

that the withheld information is in some material respect different from that to which plaintiff refers.

Plaintiff points to three public documents that he says disclose information fitting the above description of State Department category A (candid U.S. assessments of confidential Iranian views of plaintiff's activities). All three have been released in this lawsuit and contain deletions.

Plaintiff first cites a 1974 CIA dispatch from headquarters to another CIA office (CIA document no. 2) that reports that plaintiff's printing of "libelous, irresponsible and inaccurate statements about the Shah and the GOI [Government of Iran]" had "created a problem between U.S. agencies, including this agency, and the Shah," resulting in a "heavy volume of official correspondence between the State Department and the Iranian MFA [Ministry of Foreign Affairs]." J.A. 255. The document describes U.S. attempts to close down plaintiff's newspaper. *Id.*[9]

The other two documents are a cable and memorandum generated by the State Department discussing Iranian objections to the fact that plaintiff was granted a United States passport in 1970. The cable (State Department document no. 4), sent in 1973, from the United States Embassy in Iran to headquarters, says that plaintiff "is regarded by Iran as [a] notorious fraud, embezzler and supporter of anti-Shah activities in [the] U.S." and comments that the Iranian government was probably "dredging up this case" to suggest that "anti-Shah elements" in the United States be "tid[ied] up" prior to the Shah's visit to this country. J.A. 256.[10] The other document (State Department document no. 36) contains the State Department's response to the above cable and reports that the United States charge d'affaires was summoned to the Iranian foreign ministry and asked about the passport, and that the American official answered that a routine check had turned up no reason to deny plaintiff the passport. J.A. 256.

None of these documents fits squarely within category A, which deals with views expressed by specific senior Iranian officials who wished to remain anonymous. *See* J.A. 222–23. It is clear that a foreign government official may be vulnerable to separate punishment or retaliation for his or her individual contacts with the CIA. Thus, the need to keep contacts with individuals secret in order to maintain the confidence of foreign sources may be as great as or even greater than when the contact is identified as being with the government as an institu-

---

**9.** Plaintiff claims that this CIA dispatch contains in addition, presumably through its mention of "a problem between . . . this agency[ ] and the Shah," information that fits the description of CIA categories A and B. Those categories are made up of information that reveals the existence or details of a CIA intelligence relationship with SAVAK, the Iranian intelligence service during the reign of the Shah. *See supra* note 6.

 The 1974 dispatch, however, does not mention SAVAK, which appears to be crucial to the secrecy of documents in categories A and B. The CIA may have had official or semi-public relations with the Shah's government, while maintaining secret relations with SAVAK. It is the existence of the foreign intelligence services that the affidavits say must often be kept officially secret. Also, the dispatch does not suggest the kind of on-going trading of information that is implied by the term "intelligence relationship" in the CIA affidavits. This fleeting reference does not require the agency to justify further its withholding of the documents in CIA categories A and B.

**10.** Plaintiff claims that this document also contains State Department category D information, that is, information supplied in confidence by a foreign government, in its discussion of "plaintiff's activities." Brief for Plaintiff-Appellant at 19. The State Department claims that foreign government information is properly classified, and therefore exempt, because under the terms of E.O. 12,065 its release "is presumed to cause at least identifiable damage to the national security," E.O. 12,065, *supra* p. 1129, § 1–303, 3 C.F.R. at 193. J.A. 223.

 The only language in the cable that can conceivably be said to deal with "plaintiff's activities" is the broad characterization of plaintiff as a "notorious fraud, embezzler and supporter of anti-Shah activities in [the] U.S." This appears to us to be no more than the most general statement of Iranian views concerning known facts; it is not phrased as the passing of information on plaintiff, and it does not fall within an unstrained reading of the phrase "foreign government information."

tion. For this reason, disclosure of the withheld information could cause damage not already caused by the information released. Also, the assessments contained in these documents are so general—such as the fact that plaintiff has "created a problem" in U.S.-Iranian relations—or innocuous—such as the view that Iran regarded plaintiff as a "notorious" supporter of anti-Shah activities—that it can readily be understood why the government did not view them as being as "candid" or "confidential" as the documents in category A.

Plaintiff also seeks further explanation of the CIA's withholding of information contained in CIA categories A, B, and D in light of publications and public documents that plaintiff says disclose the supposedly secret information. The information plaintiff seeks from categories A and B would, if it exists, reveal the existence and details of the CIA's supposed intelligence relationship with SAVAK;[11] the information sought from category D would, if it exists, uncover the existence of a CIA station in Tehran during the reign of the Shah.[12]

Plaintiff points first to a number of books by former CIA agents and officials, all of which were submitted to the agency for prepublication review, and which discuss the existence of CIA stations in foreign countries or the existence of a specific intelligence relationship between the CIA and foreign intelligence services. In particular, plaintiff refers to *Countercoup: The Struggle for the Control of Iran* (1979), a book by Kermit Roosevelt, the former head of the CIA's Middle East Department. In the book, Roosevelt states that the CIA helped to "organize and give guidance to a new Iranian intelligence service" in the years after the Shah returned to the throne in 1953, and cites a speech to that effect by former CIA Director William Colby. *Id.* at 9 & n.*. Discussions in other books, plaintiff says, reveal CIA stations in, or intelligence liaisons with, foreign countries other than Iran.[13]

Plaintiff's argument must fail for three reasons. First, none of these books specifically reveals a continuing relationship between SAVAK and the CIA after 1963, the date of the earliest dated document withheld in this case. *Countercoup* limits its comments to the early organization and training of SAVAK. Second, these books provide only the most general outline or suggestion of a CIA–SAVAK relationship. The raft of category A, B, and D documents in this case, each of which apparently details a specific contact between the CIA and a foreign intelligence service, would give a far more precise idea of the extent to which the services relied upon each other. *See Lamont,* 475 F.Supp. at 772 (withheld information must have "already been *specifically* revealed to the public" before court will order release (emphasis added)). We think it clear that the agency is entitled to keep such details secret. Third, none of the books is an official and documented disclosure, as the release of CIA cables would be.

With regard to the third reason, plaintiff asserts that the CIA's screening and approval of the books brought them into the official realm and made the disclosures

---

**11.** *See supra* note 6.

**12.** The CIA's category D consists of information "which reveals the location of a CIA field installation or operation in a foreign country." J.A. 75. Plaintiff now seeks only information regarding the principal CIA station in prerevolutionary Tehran, but does not seek information as to other stations in Iran or elsewhere. Brief for Plaintiff-Appellant at 8. The agency claims exemption 1 as to this information, asserting that official acknowledgment of the existence of specific activities in specific foreign countries would lead to retaliation, with "obvious" effect upon the nation's foreign relations and national security. J.A. 75–76.

**13.** *E.g.,* R. Cline, *Secrets, Spies, and Scholars: Blueprint of the Essential CIA* 123–27, 172, 176–77 (1976) (Britain, Taiwan, West Germany); W. Colby, *Honorable Men: My Life in the CIA* 103, 104, 115, 142, 147, 148–49, 324, 365 (1978) (Austria, Taiwan, Indochina, Italy, Philippines, Burma, South Vietnam, Mexico, Israel); H. Rositzke, *The CIA's Secret Operations: Espionage, Counter-Espionage, and Covert Action* 45, 180, 187, 189–91 (1977) (Germany, Austria, Greece, Turkey, South Vietnam, Philippines, Ecuador; such liaisons called "routine").

therein "tantamount to official executive acknowledgments, rather than unauthorized comments by . . . former government official[s]." Brief for Plaintiff-Appellant at 18. We disagree. The damage sought to be avoided is retaliation by foreign governments for the conscious and official exposing of their intelligence services and of the CIA's links therewith. Publications such as those cited by plaintiff are not generally treated as official disclosures by foreign governments or by the public in the same way a CIA cable would be. Most of the books do not mention the fact that they have been cleared by the CIA. *See, e.g.,* K. Roosevelt, *supra.* Book reviews of books such as these, far from treating them as authoritative official announcements, regard them as autobiography and frequently point out perceived colorations, errors, and omissions in them. *See, e.g.,* Binder, N.Y. Times, Jan. 9, 1977, § 7, at 2, col. 1 (reviewing R. Cline, *supra* note 13, and J. Smith, *Portrait of a Cold Warrior* (1976)) (pointing out that Cline did not know of his superiors' covert plan to instigate uprisings in Eastern Europe after release of 1956 Khrushchev speech); Powers, *Spy Stories,* N.Y. Times, May 21, 1978, § 7, at 1, col. 1, 34, col. 3 (reviewing W. Colby, *supra* note 13, and V. Walters, *Silent Missions* (1978)) (discussing Colby's dismantling of the CIA's counterintelligence program, a subject "alluded to but not elaborated upon in Mr. Colby's memoirs"). These books, frequently written in the first person, are received as the private product of their authors, like any other memoirs, and are accorded such respect as their content seems to deserve. The fact of CIA approval does not usually figure prominently in their marketing or in their reception.

Plaintiff also points to an FBI cable and a letter to plaintiff's counsel from FBI Director Clarence Kelley as revealing a cooperative relationship with a foreign intelligence service. Plaintiff appears to believe

this information undermines the withholding of documents in FBI category E, which incorporates, *inter alia,* CIA categories A and B, regarding liaisons with foreign intelligence services. Brief for Plaintiff-Appellant at 21–22.[14] The cable reports a telephone call from plaintiff's counsel to the FBI in which the attorney reported a meeting attended by one Mansur Rafizadeh at which the assassination of plaintiff was allegedly planned. The cable notes that Rafizadeh "is the principal representative of SAVAK in the U.S. and is a foreign liaison source of the [Bureau's New York office]." J.A. 266. The letter from Kelley answers certain questions raised by plaintiff's counsel by acknowledging that the FBI has "established liaison with SAVAK officers who have contacted our field offices." J.A. 272. Kelley states that such foreign liaison officers voluntarily furnish information to the FBI "primarily" in connection with "the FBI's responsibilities for protection of foreign officials and establishments in the United States." He adds, "We merely accept any information which is volunteered." *Id.*

The problem with this information is that it does not even arguably fall within CIA categories A and B because it concerns the FBI, not the CIA. The government's affidavit states clearly that this category of information concerns "cooperative arrangements between the Central Intelligence Agency and the intelligence and security services of foreign countries." J.A. 73; *see* J.A. 74 (disclosure would result in curtailed cooperation between "the Agency" and other intelligence services); *see also* J.A. 113–15 (FBI category E deletions justified by reference to CIA categories). The government is free to reveal certain relationships with SAVAK and not others, and its reason for doing so in this case is obvious, given the ambivalent international reputation of the CIA and its apparently active intelligence-gathering apparatus as compared to

---

**14.** FBI category E contains information originating with the CIA but contained in FBI files. J.A. 131–32. The CIA has submitted an affidavit justifying those specific deletions and withholdings by assigning them to the same catego-

ries it used in justifying its own deletions. J.A. 113–15.

For a further description of CIA categories A and B, *see supra* note 6.

the assertedly passive international posture of the FBI.

### B. *Balancing Requirement of E.O. 12,-065*

Plaintiff argues that the documents as to which the government claims exemption 1 are not "properly classified" within the meaning of that exemption because the government failed to balance the public interest in disclosure against the damage to national security that disclosure might reasonably be expected to cause. Such balancing, plaintiff asserts, is required under section 3–303 of E.O. 12,065, *supra* p. 1129, 3 C.F.R. at 197, which reads as follows:

> 3–303. It is presumed that information which continues to meet the classification requirements in Section 1–3 requires continued protection. In some cases, however, the need to protect such information may be outweighed by the public interest in disclosure of the information, and in these cases the information should be declassified. When such questions arise, they shall be referred to [an appropriate official, who] will determine whether the public interest in disclosure outweighs the damage to national security that might reasonably be expected from disclosure.

Plaintiff claims that his request for the documents in this case sufficiently raises a question as to whether the public interest in disclosure outweighs the need for protection, because the information "is indispensable to thorough and reasoned public consideration of the extent to which foreign intelligence services are permitted to operate in this country and the extent to which our government cooperates with such services to the detriment of United States citizens." Brief for Plaintiff-Appellant at 26. CIA and State Department officials answered in affidavits that they found that circumstances that would require balancing did not exist and they therefore did not refer the documents to the appropriate official for balancing.[15]

After oral argument in this appeal, President Reagan issued a new Executive Order, which, *inter alia,* repealed the balancing provision of E.O. 12,065. *See* E.O. 12,356, *supra* note 4. Upon this court's order, the parties submitted supplemental memoranda addressed to the effect of the new Executive Order on this appeal. Defendants argued that the new Executive Order made it unnecessary to address the plaintiff's balancing argument since the failure to balance would be at most harmless error.[16] Plaintiff countered that *Lesar v. United States Department of Justice,* 636 F.2d 472,

---

**15.** The responsible CIA official referred in his affidavit to CIA regulations implementing the balancing provisions and to background materials on the Executive Order and stated that he had "determined that ... circumstances [requiring such balancing] do not exist." Affidavit of Robert E. Owen (dated Dec. 4, 1979), J.A. 230. The State Department official directing the review of plaintiff's request stated in his affidavit that he "did not perceive any public interest issue such that I would have referred the question to an individual for balancing in accordance with the Executive Order." Affidavit of Henry Precht (dated Dec. 19, 1979), J.A. 233.

**16.** The government cites *Halkin v. Helms,* 690 F.2d 977, 994 n. 65 (D.C.Cir.1982), in support of this argument. *Halkin,* however, was decided in a posture very different from that of the present case and does not govern the result here. In *Halkin,* the agency had taken final action under an Executive Order that did not contain a balancing provision. The plaintiffs argued to the District Court in a motion for

reconsideration that the Executive Order in effect at the time of decision—by that time, E.O. 12,065, which contained the balancing provision—should govern. *See id.* at 986 n. 34. The plaintiffs made this argument again to this court on appeal, but by the time the appeal was decided the Executive Order in effect was E.O. 12,356, which had once again eliminated the balancing provision. Therefore, the court could dispose of the plaintiffs' argument by stating that even if it were true that the Executive Order in effect at the time of decision should govern, that Order no longer could be said to require balancing. Here, plaintiff argues that the Executive Order at the time the government acted governs, and that that Order requires balancing. We decide that, assuming *arguendo* that balancing was required when the government acted, we would not, in light of the issuance of a superseding Executive Order, order the government to perform that balancing today.

480 (D.C.Cir.1980), required the court to apply the Executive Order in effect at the time the government ruled on the FOIA request, and further argued that on remand the government should be required to conduct the balancing to which plaintiff was supposedly entitled under E.O. 12,065.

In *Lesar* the District Court upheld the Justice Department's determination that certain documents were properly classified under Executive Order 11,652, 3 C.F.R. 375 (1973) (revoked 1978). After the District Court's judgment, Executive Order 12,065 was issued. This court held that the classification of the documents should be assessed "under the Executive Order in force at the time the responsible official finally acts." 636 F.2d at 480 (emphasis omitted). The court reasoned that since E.O. 12,065, the new Executive Order, contemplated that information classified under prior orders would continue to be classified, a reviewing court should assess the classification according to the Executive Order in effect at the time of classification. *Id.* The court also found that this rule "makes sense," because to hold otherwise and require a remand whenever a new Executive Order issued during the pendency of an appeal "would not only place a heavy administrative burden on the agencies but would also cause additional delays in the ultimate processing of these types of FOIA requests." *Id.*

Because the court in *Lesar* did not remand the documents to the agency for further proceedings, it did not discuss what Executive Order the government would be directed to apply on remand if its original classification were found to have been faulty. Nevertheless, *Lesar* and other cases suggest that the agency may if it desires reclassify documents under new Executive Orders issued after its initial classification decision, *see id.,* or even while the case is pending in district court, *see Military Audit*

*Project v. Casey,* 656 F.2d 724, 736 (D.C.Cir. 1981); *Baez v. United States Department of Justice,* 647 F.2d 1328, 1333–34 (D.C.Cir. 1980); *Lamont v. Department of Justice,* 475 F.Supp. 761, 769 n. 29 (S.D.N.Y.1979) (district court ordered reevaluation of classified documents under new Order).[17] Plaintiff argues that *Baez,* and presumably these other cases, are distinguishable from the case at bar because they did not result in denial of a benefit that the plaintiffs had enjoyed under the old Order. Appellant's Supplemental Memorandum at 5 n.**. The new Order involved in *Baez* and the other cases generally decreased the amount of classifiable material and expanded declassification procedures. Plaintiff argues that the government should not be allowed to apply E.O. 12,356's revocation of the balancing provision retroactively because denial of his right to balancing would work an " 'unfair change in his substantive rights or obligations' " or a " 'manifest injustice.' " *Id.* at 5–6 (quoting *Johnson v. Lehman,* 679 F.2d 918, 921 (D.C.Cir.1982), and *Coe v. Secretary of HEW,* 502 F.2d 1337, 1340 (4th Cir.1974)). *See generally Bradley v. School Board,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974) ("[A] court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary.").

The answer to plaintiff's argument is twofold. First, the rationale for allowing the Executive to apply new Executive Orders to documents in a pending suit is that the needs of national security change and that the Executive should be able to respond quickly to those changes. *Baez* gave the example of documents pertaining to Iran and Afghanistan that might not have warranted high protection before the Iranian revolution and taking of American hostages or the Soviet invasion of Afghanistan, but might require the utmost secrecy dur-

---

**17.** Upon plaintiff's request in this case, the government apparently reconsidered the classification of the documents after the issuance of President Carter's classification order. *See* Letter from Jack D. Novik to Stephen S. Cowen, Oct. 25, 1978, Record at 77, app.; J.A. 71–73, 211. After oral argument in this court,

counsel for the government suggested that the government might seek "an opportunity to review the material at issue under the new Executive Order" promulgated by President Reagan. Letter from Leonard Schaitman to the Court, June 9, 1982, at 2. The government has made no request to conduct such a review, however.

ing or immediately after the crises in those countries. 647 F.2d at 1334. This rationale is equally applicable here, even though in this case there is no identifiable incident that triggers an increased need for secrecy. This court will not, in the absence of any evidence of illegitimate discrimination, and perhaps not even then, question the President's determination that the national security requires increased secrecy.

Second, we do not agree that FOIA and the then applicable Executive Order create substantive rights that vest in plaintiff at the time of final administrative action. FOIA is not the kind of statute that is primarily concerned with individual rights, unlike, for example, the regulation that provided the plaintiff in *Greene v. United States,* 376 U.S. 149, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964), with rights to wrongfully deprived earnings. *See Bradley,* 416 U.S. at 717, 720, 94 S.Ct. at 2019, 2020 (public or private nature of rights in dispute is important in deciding whether to apply statutes retroactively). Rather, it is primarily a "good government" law, designed first and foremost "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 242, 98 S.Ct. 2311, 2327, 57 L.Ed.2d 159 (1978); *see also Military Audit Project,* 656 F.2d at 730 n. 11 ("Under the Freedom of Information Act, the identity of the requester is immaterial ....."); 5 U.S.C. § 552(a)(3) (records are to be made available, upon request, "to any person").

 In these circumstances, we think the primary interest resisting allowing the government to apply the new Executive Order on remand is not plaintiff's interest in obtaining the balancing he says he was entitled to, but rather the Act's concern with encouraging speedy resolution of re-

quests. Nevertheless, while allowing the delay in this case to enable the government to avoid balancing might encourage certain agencies to delay responding to FOIA requests in the future in anticipation of a change in presidential administrations, the Act prescribes other ways to encourage expedition. *See id.* § 552(a)(6) (agency must respond to requests within 10 days, with possible extension of 10 days); *id.* § 552(a)(4)(D) (court shall place FOIA cases first on its docket except as to cases it considers of greater importance). We conclude that the evident national interest in allowing the President to respond quickly to shifts in the need for secrecy must take precedence. *Cf. Greene,* 376 U.S. at 164, 84 S.Ct. at 623 (dictum) (although plaintiff's entitlement to damages was determined under expired regulations, Court said a claim seeking to have his security clearance reinstated would be judged by current regulations). Therefore, were we to find that the government should have engaged in the balancing that plaintiff alleges was required by section 3–303 of E.O. 12,065, a not unlikely result on this record, we are certain that we would not order the government to reconsider the classification of the documents at issue here under the now defunct provisions.

Since the court may no longer award the relief plaintiff seeks—a remand with orders to balance the public interest in disclosure against the need for secrecy—his objection to the proper classification of the documents has in effect been mooted by the issuance of the new Order. We therefore remand and instruct the District Court to vacate its Findings of Fact and Conclusions of Law insofar as they relate to this point.[18]

## C. *Independence of Exemption 3 from Exemption 1*

Plaintiff argues that the government cannot withhold material under exemption

---

18. It might be argued that this court should remand to the agencies so that they might reclassify the documents under the new Order, in order to ensure that the documents are properly classified under *some* Order. We do not think this is necessary because it is apparent that the balancing provision of E.O. 12,065, set

out as it is in a separate section called "Declassification Policy," is severable from the classification procedures of that Order. The documents in this case were therefore at one time properly classified. Normally, of course, the government must correctly follow the procedures for declassification as well as those for

3 and 50 U.S.C. § 403(d)(3) unless it is properly classified within the meaning of exemption 1. Since we have upheld the government's claims under exemption 1, *see supra* parts II(A) and (B), and since the government does not appear to have relied only on exemption 3 as to any of the documents at issue in this appeal, *see* J.A. 75, 113, we need not reach this argument. In any case, we have recently rejected it.

*Gardels v. CIA,* 689 F.2d 1100, 1107 (D.C. Cir.1982) ("Exemption 3 is independent of Exemption 1 and may be invoked independently.")

### D. *Agency Adoption of Recommendations Withheld Under Exemption 5*

Plaintiff asserts that the FBI should have been required to indicate, before its claim

classification in order for a document to be properly classified. In this case, however, the relevant declassification procedures have been eliminated without replacement. Even as a technical matter, therefore, the documents may be said to be "properly classified" under the now modified old Order.

Our view is motivated more by the practical realities of the situation, however, than by the technicalities. We think it is of great importance that the substantive classification criteria of E.O. 12,065 are all included in the new Executive Order, so that all documents classifiable under the old Order would also be classifiable under the new one. *See* Appellant's Supplemental Memorandum at 2 n. *. *Compare* E.O. 12,065, *supra* p. 1129, §§ 1–301, 1–302, 3 C.F.R. at 193, *with* E.O. 12,356, *supra* note 4, § 1.3(a), (b), 47 Fed.Reg. at 14,876. Moreover, the new Order provides that information can only be declassified if it no longer meets the new Order's classification criteria. *See id.* § 3.1(a), 47 Fed.Reg. at 14,878. It appears to us clear, therefore, that the change of law here would not result in these documents being declassified. We are reluctant, as all courts are, to require procedures that have only formal significance. *See Lesar,* 636 F.2d at 485 ("A remand to the district court [because of a procedural error that did not "reflect adversely on the agency's overall classification decision"] thus would be a useless exercise.").

To the extent that the decision in this case gives present effect to that provision of E.O. 12,356 that revoked the balancing provision of E.O. 12,065, it limits the broad statement in *Lesar* that *"a reviewing court should assess classification under the Executive Order in force at the time the responsible official finally acts," id.* at 480 (emphasis in original). While we agree that that practice is a sound one generally, we think it would be a futile exercise where the ultimate result—the classification of the documents—would not be changed. We do not think our holding dramatically undermines *Lesar* because we think the situation here, in which a new Executive Order has clearly stripped away an unreplaced, severable portion of the former Order, but otherwise left the old Order essentially unchanged, is a rare one.

Moreover, the result in this case upholds the policy enunciated in *Lesar* of avoiding a re-

mand just because a new Executive Order is issued during an appeal. *See id.* at 480. Also, if we follow the lead of *Lesar* and look to the current Executive Order for guidance on the standards to be applied in review, we find indications that former declassification procedures are to be disregarded, at least as to documents still under agency classification. The new Order provides that all previously classified material is to stay classified until no longer requiring protection under the new Order, *see* E.O. 12,356, *supra* note 4, §§ 1.4(a), 3.1(a), 47 Fed. Reg. at 14,877, 14,878, certain material previously declassified is to stay declassified unless the classification is extended (presumably before release), *id.* § 1.4(b), 47 Fed.Reg. at 14,877, but that material marked for automatic declassification under E.O. 12,065's procedures for declassification of 20-year-old documents is to remain classified until reviewed under the new Order, *id.* § 1.4(c), 47 Fed.Reg. at 14,877. Thus, the Order evinces an intent that former declassification procedures are not to be applied to documents that have retained their classification. This may suggest that a reviewing court should not review a failure to declassify under the old procedures, at least where those procedures, like the 20-year-declassification procedures of E.O. 12,065, have been completely eliminated.

It is true that the world situation with respect to Iran has changed since the government's classification decision and that the documents plaintiff seeks may no longer require the protection they did at that time. It may be argued that the plaintiff should benefit from any change in facts if the government benefits from a change in law. Such a course, however, would result in a remand in this case solely in order to take account of a change in the world situation, which would be inimical to the need for speedy and final resolution of FOIA requests to which the Act and *Lesar* pay heed. *See Tuchinsky v. Selective Service System,* 418 F.2d 155, 158 (7th Cir.1969) (agency not required to "'run what might amount to a loose-leaf service'" by continually sending out current memoranda) (quoting district court opinion); *cf. McGehee v. CIA,* 697 F.2d 1095, 1101, 1103–05 (D.C.Cir.1983) (agency may establish reasonable cut-off date in its FOIA search).

under exemption 5 was upheld, whether advice contained in the withheld portions of two memoranda was in fact adopted as the basis for agency action. The FBI's affidavit states that the memoranda, one an intra-agency memorandum from the Washington Field Office to headquarters and the other a letterhead memorandum from the Philadelphia Field Office suitable for dissemination to outside agencies, contain identical information. *See* Answers to First Set of Interrogatories Propounded by Plaintiff to Defendant Federal Bureau of Investigation at 12, answer to interrogatory no. 4 (dated Feb. 1, 1978), Record at 61. That information is described as "an advisory recommendation from the Washington Field Office concerning possible approaches to be taken in regard to contact with another Government in obtaining information about plaintiff." J.A. 118. Exemption 5 allows the government to withhold "interagency or intra-agency memorandums or letters which would not be available by law to a party ... in litigation with the agency." 5 U.S.C. § 552(b)(5). Plaintiff cites *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975), for the proposition that exemption 5 does not apply to memoranda "that have been adopted as the basis for agency action." Reply Brief for Plaintiff-Appellant at 11.

In *Sears,* the Court held that certain memoranda in which the NLRB General Counsel directed that a complaint not be filed on behalf of a private party were not exempt from disclosure under exemption 5. The Court found that while exemption 5 incorporated an executive privilege allowing the government to keep its decision-making processes from being exposed to the public, that privilege protected only predecisional communications and not communications made after the decision and designed to explain it. 421 U.S. at 151–52, 95 S.Ct. at 1516.

The Court offered two reasons for this distinction. First, it found that "the ultimate purpose" of the privilege was to prevent injury to the quality of agency decisions by ensuring the frank provision and discussion of advice and recommendations.

*Id.* at 151, 95 S.Ct. at 1516. This policy was not served by protecting communications occurring after the decision has been reached. Second, protecting predecisional but not postdecisional communication is supported, the Court said, by the increased public interest in knowing the basis for agency policy already adopted. The reasons for agency policy actually adopted constitute, if they are expressed within the agency, the " 'working law' of the agency," *id.* at 153, 95 S.Ct. at 1517, or " 'the agency's effective law and policy,' " *id.* (quoting Davis, *The Information Act: A Preliminary Analysis,* 34 U.Chi.L.Rev. 761, 797 (1967)). The Court found that the desirability of disclosing such "law" was "powerfully supported" by the affirmative disclosure obligations of the Act, which require the government to index and release "final opinions ... made in the adjudication of cases," "statements of policy and interpretations," and "administrative staff manuals and instructions to staff that affect a member of the public," 5 U.S.C. § 552(a)(2). 421 U.S. at 153–54, 95 S.Ct. at 1517.

The *Sears* Court held that the memoranda instructing the staff to decline to file a complaint were designed to explain a decision already reached and were thus post decisional. *See id.* at 155, 95 S.Ct. at 1518. It also held that the memoranda were "precisely the kind of agency law in which the public is so vitally interested," *id.* at 156, 95 S.Ct. at 1519, and were "final opinions ... made in the adjudication of cases," *id.* at 158–59, 95 S.Ct. at 1520. Finally, it held that any predecisional documents incorporated by express reference in these non exempt memoranda would lose their exemption. *Id.* at 161, 95 S.Ct. at 1521. As to the last holding, the Court reasoned that "[t]he probability that an agency employee will be inhibited from freely advising a decisionmaker for fear that his advice, *if adopted,* will become public is slight." *Id.* (emphasis in original).

It is this last holding that is at issue here. It suggests that if a recommendation contained in a predecisional memorandum is expressly adopted or incorporated by refer-

ence in a nonexempt postdecisional memorandum, the predecisional recommendations must be made public as well. There is little question that the memoranda in the case at bar were predecisional when written. Plaintiff appears to argue that whenever the government invokes exemption 5 to protect such a predecisional memorandum, it must show that the memorandum was not expressly adopted as the basis for agency action. We need not address this question, because there is substantial evidence in this record that the memoranda at issue were so adopted.

The recommendations advanced in the memoranda apparently concern a memorandum dated October 1, 1975, from the Philadelphia Field Office to the FBI Director requesting that the Washington Field Office obtain certain information and documents about plaintiff for use in his forthcoming perjury trial. Airtel from SAC, Philadelphia, to Director, FBI, Oct. 1, 1975, MF 1, Doc. 15, at 3–4, Record at 80 (attachment to Affidavit of Thomas L. Wiseman (dated Jan. 12, 1979) [hereinafter cited as Wiseman Affidavit]). (The indictment was ultimately dismissed.) The information and documents sought concerned plaintiff's alleged 1967 arrest and conviction in Iran for forgery and embezzlement, about which plaintiff had allegedly lied during a civil trial in Harrisburg, Pennsylvania. *Id.* at 2. The Philadelphia Field Office suggested that the Washington Field Office obtain the information and documents from the Iranian Embassy in Washington, D.C. *Id.* at 3. The Washington Field Office responded on November 4, 1975, that its files "reflect[ed] numerous high level communications between U.S. State Department and Bureau concerning AFSHAR," many of which were classified, and that the Shah of Iran "apparently had taken a personal interest in AFSHAR and his publication of the 'Iran

Free Press.'" Airtel from SAC, WFO, to Director, FBI, Nov. 4, 1975, MF 1, Doc. 17, at 2, Record at 80 (attachment to Wiseman Affidavit, *supra*). The Washington Field Office then made the deleted recommendation concerning possible approaches to be taken in regard to contact with another government that is the subject of this appeal. *Id.*

After the same request for information and discussion of possible ways to approach the foreign government were repeated in the letterhead memorandum, the Washington Field Office evidently decided not to proceed with its earlier assignment to ask the Iranian Embassy for the information. The Philadelphia office reported that decision to the Director, and in doing so it appears to have expressly adopted the reasons given for that course of action in the portions of the memoranda that are in dispute here. The memorandum from Philadelphia to the Director encloses the letterhead memorandum and states, "It is noted that items and leads set forth for coverage by WFO [Washington Field Office] in re Philadelphia airtel [the October 1, 1975, request for information] have not been handled. *The reasons are set forth by WFO in re WFO airtel* [evidently, the November 4, 1975, memorandum [19]] *and further explained in enclosed LHM* [letterhead memorandum]." Airtel from SAC, Philadelphia, to Director, FBI, Nov. 13, 1975, MF 1, Doc. 26, Record at 80 (attachment to Wiseman Affidavit, *supra*) [emphasis added]. Thus, it appears that the deleted material here was in substance a recommendation that the information sought by Philadelphia not be obtained through the Iranian Embassy in Washington; and it further appears that that recommendation was expressly adopted by the Washington and Philadelphia offices for the reasons advanced therein.[20]

**19.** The term "re WFO airtel" would normally mean that the Washington Field Office's airtel was cited in a reference line in the heading of the present document. No WFO airtel is cited in the reference line of the November 13 memorandum from Philadelphia, but it appears that

the November 4 WFO airtel, the one at issue here, is the only one that makes sense.

**20.** Eventually, apparently, the State Department advised that the "best way" to obtain the "information as requested in LHM prepared on subject would be to go through the U.S. Em-

This might be the end of our inquiry, except that defendants argue that "the limitation upon exemption (b)(5) when agencies adopt recommendations is essentially linked to adoptions of policies or interpretations of law," and that the memoranda at issue raise no question of "secret law," but merely recommend investigative techniques, applicable only to plaintiff. Brief for the Appellees at 45 (citing *Schwartz v. IRS,* 511 F.2d 1303, 1305–06 (D.C.Cir.1975) (dictum) (purpose of limitation on exemption for internal memoranda is "to prevent bodies of 'secret law' from being built up")). The argument is that the *Sears* requirement that predecisional documents incorporated in postdecisional memoranda be disclosed applies only to memoranda that constitute the " 'working law' of the agency," and that the decision to pursue a certain investigative technique to get information on plaintiff does not constitute "working law."

The government's distinction between "working law" and "investigative techniques" in this context is not free of doubt. The Supreme Court in *Sears,* for example, restated its reluctance to allow lawmaking memoranda to be withheld as applying to any "decision already reached ... which has real operative effect," 421 U.S. at 160, 95 S.Ct. at 1521, which would include decisions to use certain investigative techniques. *Cf. id.* at 156 n. 22, 95 S.Ct. at 1519 n. 22 (declining to decide whether a prosecutor makes "law" when he decides not to prosecute).

Nevertheless, we recognize that there is a narrow definition of "working law" that limits the term to those policies or rules, and the interpretations thereof, that "either create or determine the extent of the substantive rights and liabilities of a person." *Cuneo v. Schlesinger,* 484 F.2d 1086, 1090 (D.C.Cir.1973) (cited in *Sears,* 421 U.S. at 153, 95 S.Ct. at 1517), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974). This appears to be the definition understood

by all the sources relied upon by the Supreme Court in *Sears* for the proposition that "working law" is not protected by exemption 5. *See* 421 U.S. at 153, 95 S.Ct. at 1517. All of the sources apparently operate under the assumption that the reason "working law" should be disclosed is that a private party may have cause to rely on it. *See Bannercraft Clothing Co. v. Renegotiation Board,* 466 F.2d 345, 352 (D.C.Cir.1972) ("Congress was ... troubled by the plight of those forced to litigate with agencies on the basis of secret laws or incomplete information."), *rev'd,* 415 U.S. 1, 94 S.Ct. 1028, 39 L.Ed.2d 123 (1974); *Ash Grove Cement Co. v. FTC,* 371 F.Supp. 370 (D.D.C.1973) (semble), *aff'd in part & rev'd in part,* 511 F.2d 815 (D.C.Cir.1975); Davis, *supra* p. 1139, at 797 (such law may be applied to "individual cases" and should not be withheld from "affected parties"); Note, *The Freedom of Information Act and the Exemption for Intra-Agency Memoranda,* 86 Harv.L.Rev. 1047, 1058 n. 41 (1973) ("The 'law' of an agency is being used in the sense of the general policies, and the interpretations of the substantive law which it is supposed to enforce, that an agency applies in dealing with private parties.").

This definition would exclude from the scope of the term "working law" the government's decision in this case not to approach the Iranian Embassy, because there is little likelihood a private party might rely on it or the considerations that motivated it. This definition, as well, perhaps, as the government's somewhat broader view of "working law" as encompassing only general policies, thus removes from this case one of the rationales for forcing disclosure of adopted recommendations that was present in *Sears.*

■ Nevertheless, we do not think that the *Sears* holding that the government must disclose agency memoranda explaining a decision already made is limited to memoranda promulgating "secret law."

---

bassy in Tehran, Iran." Airtel from SAC, WFO, to Director, FBI, Dec. 12, 1975, MF 1, Doc. 27, Record at 80 (attachment to Wiseman Affidavit, *supra*). This course was followed.

Airtel from SAC, WFO, to Director, FBI, Feb. 13, 1976, MF 1, Doc. 28, Record at 80 (attachment to Wiseman Affidavit, *supra*).

The Court in *Sears* only looked to the need to prevent accumulation of secret law as additional support for the independent conclusion that postdecisional memoranda should be released because their publication would not interfere with the consultative process of government decisionmaking. *See* 421 U.S. at 152, 153, 155–56, 95 S.Ct. at 1517, 1518, 1519. It is only when disclosure would hinder that process that documents are protected by the executive privilege incorporated in exemption 5. The Court understood that the "general philosophy" of the Act is "full agency disclosure unless information is exempted under clearly delineated statutory language," S.Rep. No. 813, 89th Cong., 1st Sess. 3 (1965), which language is to be narrowly construed, *see Department of the Air Force v. Rose*, 425 U.S. 352, 361, 96 S.Ct. 1592, 1599, 48 L.Ed.2d 11 (1976). The policy underlying that philosophy was not merely to allow citizens whose rights might be affected to obtain the information necessary for fair dealings with the government,[21] but the broader policy of ensuring "an informed electorate . . . vital to the proper operation of a democracy." S.Rep. No. 813, *supra*, at 3; *see NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242, 98 S.Ct. 2311, 2327, 57 L.Ed.2d 159 (1978) ("The basic purpose of FOIA is to ensure an informed citizenry . . . ." (citing *Sears*)). Thus, the Act eliminated the requirement that a requester of information be directly concerned with the information sought. The point of view enacted was that

[f]or the great majority of different records, the public as a whole has a right to know what its Government is doing. There is, of course, a certain need for confidentiality in some aspects of Government operations and these are protected specifically; but outside these limited areas, all citizens have a right to know. S.Rep. No. 813, *supra*, at 5–6.

 The only reason agency memoranda such as those here are needful of confidentiality under the Act is that their release might inhibit the decisionmaking process. *See Sears*, 421 U.S. at 151, 95 S.Ct. at 1516 ("Manifestly, the ultimate purpose of this long-recognized privilege is to prevent injury to the quality of agency decisions."). The Supreme Court has ruled that release of documents that explain a decision already made do not injure this consultative process. *Id.* Therefore, postdecisional documents do not come within the privilege codified in exemption 5. No affirmative public need for the documents need be shown.

The same reasoning applies to predecisional recommendations that are expressly adopted in the final, nonexempt memorandum. To the extent the reasoning of the recommendations is expressly adopted, there is no longer any need to protect the consultative process. As the Supreme Court pointed out, "the reasoning becomes that of the agency and becomes *its* responsibility to defend," and "agency employees will generally be encouraged rather than discouraged by public knowledge that their policy suggestions have been adopted by the agency." *Id.* at 161, 95 S.Ct. at 1521 (em-

---

**21.** The legislative history of the Act does mention the idea that "the private citizen" should be afforded "the essential information to enable him to deal effectively and knowledgeably with the Federal agencies." S.Rep. No. 813, *supra*, at 7. This policy is advanced, however, in connection not with the release-upon-request provision involved here, but with the affirmative obligations in § 552(a)(2) to publish and index "final opinions . . . made in the adjudication of cases," "statements of policy and interpretations," and "administrative staff manuals and instructions to staff that affect a member of the public." Thus, this mention strengthens our conclusion in this case, because it suggests that it is the affirmative obligations of the Act

that are supposed to prevent the creation of "secret law," while the disclosure requirements of § 552(a)(3) are intended to serve the broader purpose of informing the citizenry about the operations of its government. *See Sears*, 421 U.S. at 153–54, 95 S.Ct. at 1517 (conclusion that "working law" is outside of exemption 5 is "powerfully supported" by requirements of § 552(a)(2)); Davis, *supra* p. 1139, at 797 ("The problem . . . is the accommodation of the purpose behind the requirements of [§ 552(a)(2)] to the purpose behind the fifth exemption.").

The parties apparently agree that the affirmative obligations of § 552(a)(2) are not involved in this case.

phasis in original). This reasoning applies to all otherwise nonsecret operations of government, regardless of whether they involve general policy or directly affect a member of the public.

This result is supported by the approach to the Act laid out in *Federal Open Market Committee of the Federal Reserve System v. Merrill,* 443 U.S. 340, 99 S.Ct. 2800, 61 L.Ed.2d 587 (1979). In that case, the Court suggested that agency documents that are binding on the public, "govern the adjudication of individual rights, ... [or] require particular conduct or forbearance by any member of the public"—that is, documents that fit approximately within the narrow interpretation of the term "working law"— would not even be "inter-agency or intra-agency memorandums" within the meaning of exemption 5. *Id.* at 352–42, 99 S.Ct. at 2808. This formulation makes the "working law" component of *Sears* a test for whether a document is an "inter-agency or intra-agency memorandum," not a test for whether it "would be available by law to a party ... in litigation with the agency," i.e., privileged. If that is the case, then it seems all that much clearer that even those inter-agency or intra-agency documents that do not determine the rights or obligations of a member of the public—and therefore may be considered "memorandums" under the *Merrill* test—are only exempt

from disclosure if they are independently privileged by being predecisional.

Any alternative result, allowing the government to withhold all memoranda that are not part of the delicate consultative process but that also do not adopt or apply a policy or law directly applicable to individual citizens, would prevent the public from finding out about a great number of government operations knowledge of which Congress thought was vital to an informed citizenry. Executive privilege in these circumstances was intended only to protect government decisionmaking from operating " 'in a fishbowl,' " S.Rep. No. 813, *supra* p. 1142, at 9; if the information at issue here must be kept secret for some other reason, other exemptions are available, *see, e.g.,* 5 U.S.C. § 552(b)(1), (7) (exemptions for classified information and for certain law enforcement investigatory records).

■ Since this record raises a genuine issue of fact as to whether the portions of the memoranda withheld under a claim of exemption 5 were expressly adopted by the agency in nonexempt memorandum explaining a final decision to take action,[22] the government was not entitled to summary judgment as to these. We remand in order to allow the government an opportunity to show that they were not so adopted.[23]

---

**22.** We think it clear that at least under the circumstances of this case, only express adoption in a nonexempt memorandum explaining a final decision will serve to strip these memoranda of their predecisional character. *See Sears,* 421 U.S. at 161, 95 S.Ct. at 1521. If the agency merely carried out the recommended decision without explaining its decision in writing, we could not be sure that the memoranda accurately reflected the decisionmaker's thinking. *See Renegotiation Board v. Grumman Aircraft Engineering Corp.,* 421 U.S. 168, 186, 95 S.Ct. 1491, 1501, 44 L.Ed.2d 57 (1975) (release of predecisional reports where Board had other reasons for its decision would be "affirmatively misleading"); *Sterling Drug Inc. v. FTC,* 450 F.2d 698, 706 (D.C.Cir.1971) (since recommendations are "filtered and refined" by ultimate decisionmaker, ultimate decision was more than, or different from, the sum of its "parts").

**23.** On remand, the government is of course entitled to try to show that segregable portions of the memoranda were not expressly adopted as the basis for action, and thus have maintained their predecisional character. For example, we note that the memoranda may contain a recommendation that the information on plaintiff be obtained through the United States Embassy in Tehran, the course ultimately followed, *see supra* note 20. It may be that this recommendation was one of the "reasons" for the refusal to get the information through the Iranian Embassy in Washington referred to in the November 13 memorandum and therefore has lost its predecisional character, or that this was a separate recommendation expressly adopted in some other memorandum, or that this remains a predecisional recommendation that may or may not be segregable from any no-longer-privileged recommendations. We leave such questions for decision by the District Court on remand.

## III

Plaintiff asserts that three errors in the procedures followed by the District Court cumulatively constitute reversible error. First, plaintiff informs us that the court adopted verbatim the proposed Findings of Fact and Conclusions of Law submitted by the defendant, and claims that these "do not reveal the discerning line for decision," *United States v. El Paso Natural Gas Co.,* 376 U.S. 651, 657, 84 S.Ct. 1044, 1047, 12 L.Ed.2d 12 (1964), otherwise fail to address certain of plaintiff's contentions, and make certain unnecessary findings. Second, plaintiff asserts that the government failed to file an adequate statement of material facts as to which there is no genuine issue, as required by D.D.C.R. 1–9(h). Third, plaintiff claims that the government's index of withheld material and reasons for withholding was not contained in a single document, as assertedly required by *Founding Church of Scientology v. Bell,* 603 F.2d 945, 949 (D.C.Cir.1979).

■ The Supreme Court has instructed that findings of fact and conclusions of law are not to be rejected out-of-hand merely because they were prepared by counsel. *El Paso Gas,* 376 U.S. at 656, 84 S.Ct. at 1047. While adopting verbatim such prepared findings is rarely the best approach because it tends to undermine the functions of such findings in aiding the trial court's own decisionmaking process and revealing that process to the reviewing court, we will uphold the findings if they are supported by the evidence. *Id.* at 656, 84 S.Ct. at 1047. Particularly in FOIA cases, we have in addition required that the court's findings enable us to discern its chain of reasoning. *See Schwartz v. IRS,* 511 F.2d 1303, 1307–08 (D.C.Cir.1975) (failure of District Court to clarify order constituted abuse of discretion). Although, in this case it takes some extrapolation to discern the court's reasoning on some crucial points, we think these tests are satisfied here. The findings refer to all the plaintiff's major contentions and reveal that the court generally accepted the government's assertion of the harms that would flow from the release of this information.

■ The government's statement of material facts as to which there is no genuine issue merely incorporated by reference the government's affidavits and answers to interrogatories in the case. J.A. 241. We have previously underlined the inadequacy of this approach, *see Gardels v. CIA,* 637 F.2d 770, 773 (D.C.Cir.1980) (such statements fail to serve the purposes of the rule, i.e., to isolate material facts and evidence, and to identify disputes), but we have stated that the District Court is within its discretion in considering a motion for summary judgment in the absence of such a statement, *id.,* unless the plaintiff suffered identifiable prejudice as a result, *see id.* at 774. Particularly in light of the reasonably detailed statement of points and authorities submitted by the government, which cited parts of the record in support of its conclusions, Record at 114, we see no evidence of prejudice here.

■ With regard to plaintiff's complaints about the multiplicity of affidavits in this case, it is true that one of the indispensable elements of a *Vaughn* index remains that it be "contained in one document, complete in itself." *Founding Church of Scientology,* 603 F.2d at 949. But common sense must be used in applying this rule. We do not think it is necessary, for example, that all defendant agencies combine their justifications as to different documents in one index. And we do not see any great significance in the fact that the justification for withholding each category of information is in an affidavit signed by one official, while each deletion is placed in one of those categories in an affidavit signed by a different official. *See, e.g.,* Supplemental Affidavit of William H. Price and Defendant Department of State's Revised Document Index (dated Jan. 24, 1979), J.A. 210 (State Department categorization of documents); First Affidavit of Henry Precht Affidavit (dated Jan. 25, 1979), J.A. 220 (State Department justifications); Strickland Affidavit (dated Jan. 11, 1979), J.A. 113 (categorization of CIA information contained in FBI documents); Supplemen-

tal Page Affidavit (dated Jan. 10, 1979), J.A. 70 (CIA justifications). So long as the affidavits interlock without confusion and clearly were drafted with each other in mind, there is no reason they cannot be thought of as a single "document." The need to allow the agencies to divide the labor of responding to FOIA requests demands some flexibility.

■ The crucial thing is that it be clear and easy to find the description of any particular piece of information and the claimed justification for withholding that piece. We think that is possible here. The few extra affidavits that do not fit the single-document test set out above were minor attempts to respond to plaintiff's objections or to comply with the court's order with respect to balancing. On the latter point, the government's failure to explain initially whether it invoked the balancing provision of E.O. 12,065, *supra* p. 1129, 3 C.F.R. at 197, was justified by the unsettled state of law on whether the question was material to the court's consideration.

### IV

We remand this case for further proceedings consistent with this opinion with regard to the information withheld under CIA category L and under exemption 5 of the Act. We also direct that those portions of the District Court's Findings of Fact and Conclusions of Law dealing with the balancing provision of E.O. 12,065 be vacated as moot. We pretermit the question of whether all information withheld by the CIA under exemption 3 must be properly classified, and otherwise affirm the District Court insofar as it upheld the government's exemption 1 and 3 claims.

*It is so ordered.*