**HUDSON RIVER SLOOP
CLEARWATER, INC. et
alia, Plaintiffs,**

v.

**DEPARTMENT OF the NAVY et
alia, Defendants.**

No. CV–86–3292.

United States District Court,
E.D. New York.

April 28, 1987.

Gold, Farrell & Marks, New York City by Leonard M. Marks, Alan R. Friedman, for plaintiffs.

Andrew J. Maloney, U.S. Atty., E.D. N.Y., Brooklyn, N.Y. by Robin Greenwald, Asst. U.S. Atty., for defendants.

## MEMORANDUM AND ORDER

SIFTON, District Judge.

This action concerns the Navy's current plans to construct and operate a "homeport" for the U.S.S. *Iowa* Battleship Surface Action Group ("*Iowa* SAG") on Staten Island in New York harbor. Plaintiffs, a coalition of conservation groups and individual citizens, seek to enjoin further planning and commencement of construction of the base until the Navy fully complies with its obligations under the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.* The matter is currently before the Court on defendants' motion for partial summary judgment on the ground that § 102(2)(c) of NEPA does not require the Navy to discuss in a publicly disseminated environmental impact statement ("EIS") potential environmental impacts associated with the deployment of nuclear weapons. Plaintiffs have cross-moved for summary judgment on the "nuclear issue." In the alternative, plaintiffs seek an order denying defendants' motion and granting plaintiffs an opportunity to conduct pretrial discovery pursuant to Rule 56(f) of the Federal Rules of Civil Procedure. Plaintiffs have moved for summary judgment compelling defendants to supplement its current EIS to include an analysis of the environmental impacts of its plan to construct housing for homeport personnel at South Beach, Staten Island.

The following background facts are essentially undisputed. Sometime in 1982 the Navy developed a new defense theory know as the Strategic Homeport Concept, the core of which involves dispersing its fleet to various locations throughout the United States, including the northeast. The theory underlying the homeport concept is, *inter alia*, to limit the vulnerability of U.S. naval forces which are now concentrated at two or three major bases and to increase their mobility and responsiveness.

In October 1983, following a competition between Boston, Massachusetts, New York, and Newport, Rhode Island, the Navy announced its decision to locate the *Iowa* SAG at Stapleton and Fort Wadsworth in Staten Island. The Navy's notice of intent to prepare a draft EIS ("DEIS") for the project stated that the SAG would comprise seven ships, including a battleship, a cruiser, three destroyers, and two fast frigates. *See* 48 *Federal Register* 48702 (October 20, 1983). The notice also stated that waterfront facilities would be located on 40 acres of currently vacant land owned by New York City, with additional facilities to be built at Fort Wadsworth, an existing, though underutilized, Army installation.

On October 19, 1984, the Navy issued a DEIS. Following the prescribed public comment period, the Navy revised the DEIS and issued a final EIS ("FEIS") on February 1, 1985. The vast majority of the public comments compiled in volume II of the FEIS expresses concern over the risks associated with development of nuclear weapons in New York harbor. While the Navy concedes that the *Iowa* SAG will be capable of carrying nuclear weapons, including nuclear Tomahawk[1] cruise missiles, neither the DEIS nor FEIS contains any discussion of nuclear weapons except to say that national security interests pre-

---

1. Unclassified Navy documents show that four ships of the SAG, including the *Iowa* and the three *Spruance*-class destroyers, will be capable of carrying both the conventional and nuclear versions of the Tomahawk sea-launched cruise missile. The Tomahawk is a long-range (1200 miles), high-yield (200 kilotons) strategic nuclear weapon, which is 16 times more powerful than the atomic bomb dropped on Hiroshima. There is also evidence suggesting that the *Iowa* SAG will be capable of carrying a variety of small, tactical nuclear weapons.

clude the Navy from either confirming or denying the presence of nuclear weapons at any station aboard any ship or aircraft. *See* DEIS at vii; FEIS at ix. The rationale for this position, the statements explain, is to "deny a potential enemy the opportunity to count weapons, determine distribution of weapons or assess employment doctrine. Additionally, by not knowing if a weapon is actually present, the policy [sic] denies information to a potential saboteur who might have as an objective a plan intended to damage, destroy or capture a weapon." *See* DEIS at 4–142; FEIS at i, 4–61.

On March 14, 1985, the Navy issued a Record of Decision ("ROD") announcing its intention to proceed with the project as set forth in the FEIS. 50 *Federal Register*, 11412 (March 21, 1985). Just four months later, however, the Navy announced that it would be preparing a supplemental EIS to discuss construction of housing facilities for homeport personnel.[2] Prior to that point, the Navy had been operating under the assumption that affordable housing would be available in the neighboring New York-New Jersey housing markets. *See* 50 *Federal Register* 30497 (July 26, 1985). On December 27, 1985, the Navy issued a draft supplemental EIS ("DSEIS") identifying four alternative plans for construction of 1,700 housing units, three of which called for varying degrees of construction at South Beach, Staten Island. Following the

close of the public comment period, the Navy issued a final supplemental EIS ("FSEIS") announcing the Navy's intention to construct approximately 1,150 new family housing units at the South Beach site.

Both the DSEIS and the FSEIS were prepared under the impression that no wetlands were present on the South Beach site.[3] *See* DSEIS at 7–4; FSEIS at D–14. However, at about the time the Navy issued its FSEIS,[4] the New York State Department of Environmental Conservation (the "DEC") advised the Navy that a portion of the South Beach site contains state-regulated freshwater wetlands[5] and that permits would be required before any construction could begin. Subsequent mapping showed that approximately 35 acres, or nearly ⅓ of the parcel, met the DEC's wetland criteria. In addition, in May 1986 the United States Fish and Wildlife Service informed the Navy that the National Wetland Inventory Map neglected to show that approximately ⅓ of the site contained freshwater wetlands. A subsequent site inspection by the Army Corps of Engineers confirmed that portions of the site met the Corps' criteria for wetlands.

On August 1, 1986, the Navy issued a notice of supplemental hearing acknowledging the presence of freshwater wetlands and calling for public comments on a revised housing and wetlands mitigation

---

**2.** Following the issuance of the ROD but before the Navy decided to supplement the FEIS, a similar coalition of citizens and environmental groups filed a virtually identical action against the Navy in the Southern District of New York. As here, the Navy moved for summary judgment on the nuclear issue, and plaintiffs cross-moved for partial summary judgment or, in the alternative, for an opportunity to conduct discovery pursuant to Rule 56(f). Before the motions were decided, Judge Kram dismissed the action without prejudice on the ground that the Navy's decision to supplement the FEIS to discuss its proposal to construct housing had rendered the case "not ripe" for resolution.

**3.** In an affidavit submitted in opposition to the present motion, the Navy states that it was aware of what it describes as a "small pocket" of approximately 10 acres of wetlands located on the southwest corner of the site. Although there is no discussion of these wetlands in the DSEIS or FSEIS, the affidavit states that consideration of the housing alternatives had taken into ac-

count all wetlands to the extent the Navy was aware of any.

**4.** The parties are in dispute as to when the letter containing this advice was actually received by the Navy. The letter is dated February 11, 1986. It was not post-marked, however, until March 10, 1986, and, according to the Navy, was not received until March 13, 1986, approximately one month after the close of the public comment period.

**5.** Freshwater wetlands are protected under Article 24 of the New York State Environmental Conservation Law. The DEC is responsible for identifying and mapping wetland areas comprising at least 12.4 acres which constitute an "area of unusual local importance" by providing such benefits as flood and storm control, wildlife habitat, protection of subsurface water resources, recreation, pollution treatment, erosion control, education and scientific research areas, open space, and food sources. *See* NYSECL § 24–0301; § 24–0105(7).

plan for the site. However, prior to the scheduled date for the supplemental hearing, a second notice was published cancelling the hearing. The cancellation notice stated that the Navy had altered its proposed housing plan to include 800 units on the "upland/non-wetland" portion of the site and that the new proposal would not "alter" any protected wetlands. Finally, on August 28, 1986, the Navy issued its ROD on the FSEIS. The ROD restates the Navy's intention to construct 800 units at South Beach, with any remaining needs to be filled in the open market. With respect to the wetlands, the ROD states that "[t]he Navy believes the South Beach site can accommodate Navy housing requirements without impacting any wetlands. The Navy will not construct housing at South Beach on any designated wetlands."

Following oral argument on the current motions, the Navy again revised its proposal for South Beach. While it has not yet revealed any specific site plans for the proposed construction, the Navy now states that it intends to build up to 1,000 units at South Beach and that none of the new structures will be built within 100 feet of any designated wetlands. Because the construction will occur outside a 100–foot "buffer zone," the Navy argues that section 24–0701.2 [6] of New York's Environmental Conservation Law relieves it of any obligation to obtain construction permits. Furthermore, since no construction will occur within this perimeter, the Navy states that it is not required to supplement the FSEIS to discuss any impact the project might have on the protected areas.

## DISCUSSION

### NEPA and Nuclear Weapons

Section 102(2)(c) of NEPA, 42 U.S.C. § 4332(2)(c), provides that "to the fullest extent possible" all federal agencies shall "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."

Section 102(2)(c) also requires that the EIS be made available to the President, the Council on Environmental Quality, and the public, subject to the restrictions on the release of information set forth in the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

■ The Navy does not argue that deployment of nuclear weapons in New York harbor would not constitute a "major" action within the meaning of § 102(2)(c). Nor does the Navy deny the fact that at least one, if not more, of the *Iowa* SAG vessels is or will be capable of deploying nuclear weapons. Rather, relying on the exemptions to public disclosure contained in § 552(b) of FOIA and the Supreme Court's decision in *Weinberger v. Catholic Action of Hawaii/Peace Education Project*, 454 U.S. 139, 102 S.Ct. 197, 70 L.Ed.2d 298 (1981), the Navy argues that information

---

**6.** Section 24–0701.2 provides:

"[A]ctivities [defined in this subsection] are subject to regulation whether or not they occur upon the wetland itself, if they impinge upon or otherwise substantially affect the wetlands and are located not more than one hundred feet from the boundary of such wetland. Provided, that a greater distance from any such wetland may be regulated pursuant to this article by the appropriate local government or by the department, whichever has jurisdiction over such wetland, where necessary to protect and preserve the wetland." DEC regulations further provide that the "Department may establish an adjacent area broader than 100 feet (approximately 30 meters) when necessary to protect and preserve a wetland." 6 NYCRR § 663.2.

relating to the deployment of nuclear weapons is classified for reasons of national security and, therefore, exempt from the public disclosure requirements of NEPA.[7] For the reasons set forth below, the undersigned agrees. Since plaintiffs have failed to show reasonable grounds to conclude that additional discovery would create a genuine issue of material fact, defendants' motion for partial summary judgment on this issue is granted.

The Navy argues that information relating to the deployment of nuclear weapons is properly classified under both Executive Order No. 12356, 3 C.F.R. § 168 (1982 Comp.), and the Atomic Energy Act, 42 U.S.C. §§ 2011 *et seq.,* and, therefore, is exempt from disclosure under FOIA Exemptions 1 and 3, 5 U.S.C. § 552(b)(1), (3). Exemption 1 exempts from disclosure matters that are "(A) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy, and (B) are in fact properly classified pursuant to such an Executive Order." Executive Order No. 12356 confers upon specified individuals the power to classify information concerning *inter alia,* "military plans, weapons or operations" and "the vulnerabilities or capabilities of systems, installations [or] projects" if the release of such information "reasonably could be expected to cause damage to national security."

Exemption 3 exempts from disclosure matters that are "specifically exempted from disclosure by statute ... provided that such statute ... establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5

U.S.C. § 552(b)(3). In this case, the Navy argues that the Atomic Energy Act specifically provides for protection of information concerning the "design, manufacture or utilization of nuclear weapons." 42 U.S.C. § 2014(y). While the Department of Energy ("DOE") is generally empowered to determine which information can be released without "undue risk to the common defense and security," § 2162(c), the Act further provides that release of information that both the DOE and the Department of Defense ("DOD") jointly determine relates primarily to the military utilization of [nuclear] weapons and which ... can be adequately safeguarded as defense information" is removed from the category of restricted data and entrusted solely to the care of the DOD. § 2162(d).

Pursuant to both Executive Order No. 12356 and the Atomic Energy Act, all information relating to the presence of nuclear weapons aboard specified naval vessels, except missile-launching submarines on patrol, is classified. *See* Joint DOE/DOD Nuclear Weapons Classification Guide CG–W–5 (Secret) (January 1984). As a result, the Navy will neither confirm nor deny the presence or absence of nuclear weapons aboard any naval vessel (excluding submarines). *See* Chief of Naval Operations (OPNAV) Instructions (S)5513.9B (March 27, 1984); OPNAV Instruction 5721.1D (July 27, 1984).[8] The Navy insists it has not wavered from this policy with regard to the *Iowa* SAG and argues that it cannot discuss, even in a hypothetical manner, the environmental effect of deploying nuclear weapons in New York harbor pursuant to NEPA.

---

**7.** At the same time, the Navy concedes that, even if it is unable to meet NEPA's public disclosure requirements, it is still obligated to prepare for internal purposes an EIS or similar document once there is an actual proposal to deploy nuclear weapons at a particular site. *See Catholic Action, supra,* 454 U.S. at 146, 102 S.Ct. at 203. Indeed, the Navy has issued the following regulation concerning classified information and compliance with NEPA:

"The fact that a proposed action is of a classified nature does not relieve the proponent of the action from complying with the NEPA. Nevertheless, the EIS, both draft and final, as well as supplements, shall be prepared, safe-

guarded and disseminated in accordance with the requirements applicable to classified information. When feasible, these documents shall be organized in such a manner that classified portions are included as annexes so that the unclassified portions can be made available to the public."

32 C.F.R. § 775.5. Plaintiffs have not argued that the Navy has failed to otherwise meet its NEPA obligations with respect to nuclear weapons in this case.

**8.** *See* Paragraph 4 of OPNAV Instruction 5721.-1D.

In *Catholic Action,* the Supreme Court squarely addressed the interaction between FOIA and NEPA with respect to nuclear weapons. There, plaintiffs challenged the Navy's failure to prepare an EIS in connection with a proposal to expand a weapons storage facility.[9] While the Navy conceded the project would include construction of magazines capable of storing nuclear weapons, it would neither confirm nor deny that any nuclear weapons would actually be present.

Pursuant to § 102(2)(c) of NEPA, plaintiffs sought a full public discussion of the risks and effects of a nuclear weapons accident and the long-term effects of radiation from the storage of nuclear weapons in a populated area. 454 U.S. at 142, 102 S.Ct. at 201. The district court denied the injunction, concluding that the Navy had already complied with NEPA to the fullest extent possible, given the restrictions imposed by the national security provisions of the Atomic Energy Act and the Navy's own regulations concerning nuclear weapons. 468 F.Supp. 190, 193 (D.Haw.1979).

On appeal, the Court of Appeals for the Ninth Circuit reversed and directed the Navy to prepare a "hypothetical" EIS that would assess the impact of the storage of nuclear weapons without revealing specific information regarding the number and type of nuclear weapons actually present at any given time. 643 F.2d 569, 572 (9th Cir. 1980).

The Supreme Court in an unanimous opinion reversed the Court of Appeals' "apparent attempt to balance what it considered to be disclosure requirements of NEPA with national security interests." 454 U.S. at 143, 102 S.Ct. at 202. Relying on the express statutory language in § 102(2)(c) of NEPA stating that public dissemination of an EIS was subject to the provisions of FOIA, the Court held that, unless information regarding the storage of nuclear weapons was obtainable under FOIA, it could not be disclosed in a publicly disseminated EIS under NEPA. *Id.* at 144, 102 S.Ct. at 202. Finding that "virtually all" information relating to the storage of nuclear weapons is properly classified by Executive Order, the Court held that FOIA Exemption 1 precluded public disclosure of such information under § 102(2)(c) of NEPA.[10] In short, "the public's interest in ensuring that federal agencies comply with NEPA must give way to the Government's need to preserve military secrets." *Id.* at 145, 102 S.Ct. at 203.

Since *Catholic Action* was decided, only one other district court has addressed these same issues. In *Laine v. Weinberger,* 541 F.Supp. 599 (C.D.Cal.1982), plaintiffs sought to enjoin operation of a naval weapons station until the Navy prepared an EIS discussing the impact of storing nuclear weapons at the station. The Navy moved for summary judgment, and in an effort to distinguish *Catholic Action,* plaintiffs argued that the Navy had *de facto* admitted that nuclear weapons would be stored there by acknowledging that the facility was capable of storing such weapons and that SUBROC and ASROC missiles, both of which are capable of carrying nuclear warheads, were in fact present. *Id.* at 602–03. The district court, however, granted summary judgment to the Navy, finding that plaintiffs had offered no "actual admission" of a proposal to store nuclear weapons but merely speculation drawn from the characteristics of the facility. *Id.* Since the Navy refused to either admit or deny the presence of such weapons, the court concluded that plaintiffs were unable to establish the existence of a proposal of any major action sufficient to trigger NEPA. *Id.*

In the case at bar, plaintiffs also seek to avoid *Catholic Action* by arguing that the Navy has in fact already made public the existence of a proposal to deploy nuclear

---

**9.** The Navy did prepare an environmental assessment in which it concluded that construction of the new magazines would have no significant environmental impact and, therefore, that it was unnecessary to prepare a fullblown EIS. 454 U.S. at 139, 102 S.Ct. at 199.

**10.** The Court also stated that the Atomic Energy Act made FOIA Exemption 3 relevant as well but did not reach this issue because of the certain applicability of Exemption 1. *Id.* at 144, 102 S.Ct. at 202.

weapons at the homeport principally through the congressional testimony of high-ranking naval officers. Thus, plaintiffs claim there can no longer be a legitimate national security interest in keeping such information classified, and, therefore, a full public discussion of the environmental effect of deploying nuclear weapons in New York harbor is required.[11] To support this claim, plaintiffs rely on a line of FOIA cases holding that Exemptions 1 and 3 may no longer be available to the government when the information sought has already been revealed to the public through official and authorized disclosures. *See, e.g., Afshar v. Dep't of State*, 702 F.2d 1125, 1130–33 (D.C.Cir.1983); *Founding Church of Scientology v. NSA*, 610 F.2d 824, 831–32 (D.C.Cir.1979); *Schlesinger v. CIA*, 591 F.Supp. 60, 68–69 (D.D.C.1984); *Nuclear Control Institute v. U.S. Nuclear Regulatory Commission*, 563 F.Supp. 768, 771 (D.D.C.1983); *Fitzgibbon v. CIA*, 578 F.Supp. 704, 715 (D.D.C.1983).

In response, the Navy denies that it has abandoned its neither-confirm-nor-deny policy regarding the homeport. With respect to the testimony by high-ranking Navy officials cited by plaintiffs, the Navy argues that a fair reading of the testimony reveals no declassification of ˙any information regarding actual deployment proposals for the *Iowa* SAG. As for other statements by its personnel, the Navy argues that such statements are in fact unauthorized leaks and, as such, do not result in declassification of otherwise classified information. *See Nuclear Control Institute, supra*, 563

F.Supp. at 771; *Murphy v. FBI*, 490 F.Supp. 1138 (D.D.C.1980); *Safeway Stores, Inc. v. FTC*, 428 F.Supp. 346 (D.D.C.1977).

■ To support their claim, plaintiffs cite the congressional testimony of Admiral James D. Watkins, the Chief of Naval Operations; Admiral Stephen J. Hostettler, the Director of the Pentagon's Joint Cruise Missile Project; and former Navy Secretary John Lehman. Plaintiffs also rely on the affidavit of retired Rear Admiral Eugene J. Carroll and numerous unclassified Navy documents. As discussed more fully below, none of these sources establish, as plaintiffs contend, that the Navy has officially disclosed a proposal to deploy weapons at the homeport.[12] Rather, the statements only tend to confirm what the Navy already admits, namely, that the ships are capable of carrying nuclear weapons.

For instance, when asked by a member of the House Appropriations Committee "What is the ultimate plan for both numbers and classes of ships that will receive the nuclear Tomahawk[?]," Admiral Watkins replied:

"The TLAM–N [nuclear Tomahawk] will go into the vertical launch tubes [VLS] of the CG–47 [*Ticonderoga*-class cruisers], DDG–51 [*Burke*-class destroyers], and the DD–963 [*Spruance*-class destroyers]. It will also be in the SSN–688 class as it stands, both the vertical launch system (TLAM/C and TLAM/N) as well as tube-launched. They will also be in the SSN–21 class [a new class of attack subma-

---

**11.** While plaintiffs have presented a great deal of information concerning the potential environmental consequences of an accidental release of nuclear materials in New York harbor, no facts have been put before the Court addressing the effect that the mere presence of a nuclear capable ship in the harbor has on an enemy's targeting strategy and the consequent impact of any change in that strategy on New York's environment. No doubt that is because of the speculative and political nature of the inquiry, requiring anticipation of an enemy's own strategic allocation of military resources. *See Greenham Women Against Cruise Missiles v. Reagan*, 755 F.2d 34 (2d Cir.1985).

**12.** The Navy apparently contends that even disclosures by its highest-ranking officials would

not result in declassification unless there has been an official decision to vary from the neither-confirm-nor-deny policy. While EO 12356 provides that information shall not be declassified automatically as a result of "inadvertent or unauthorized disclosures," it also provides that information can be declassified by a "supervisory official." Thus, to the extent that EO 12356 controls the question of whether public statements by high-ranking officials can result in the loss of FOIA exemptions if the statements actually disclosed a proposal to deploy nuclear weapons on the *Iowa* SAG, the FOIA exemptions would be unavailable to the government. The problem for the plaintiffs is that the statements cited fail to disclose such a proposal.

rines not due until the 1990's]. And I believe that is all."

While the Navy does not deny that a *Spruance*-class destroyer will be part of the *Iowa* SAG, the Admiral's statement simply fails to constitute an admission that the Navy has a proposal to deploy Tomahawks on every ship of the classes mentioned or on the particular destroyers that will comprise part of the *Iowa* SAG. Without a confirmation that any particular *Spruance*-class destroyer would carry nuclear Tomahawks at any particular time or place, Admiral Watkins' testimony did not deviate from the Navy's neither-confirm-nor-deny policy.

The following excerpts from testimony by Admiral Hostettler also fail to indicate anything more than that two of the ships in the SAG will be certified to carry nuclear weapons. Before the House Appropriations Committee, Admiral Hostettler testified:

"BB–61 [*Iowa*] class battleships, DD–693 [*Spruance*] class destroyers, CGN–9 [*Long Beach*], CGN–38 [*Virginia*] and CG–47 [*Ticonderoga*] class cruisers as well as SSN–637 [*Sturgeon*] and 668 [*Los Angeles*] class submarines will be certified to carry any desired mix of the three Tomahawk variants procured under the FY 86 buy.

\* \* \* \* \* \*

"During the FY 86 time period, at least one ship of all the classes mentioned in the answer above will be certified to carry any of the three Tomahawk variants, including the TLAM/N [nuclear Tomahawk]."

Before the Senate Armed Services Committee, he again stated:

"Two of our planned four battleships, the *New Jersey* and the *Iowa*, are now Tomahawk certified and capable of deploying with 32 cruise missiles."

While plaintiffs are no doubt correct to state that certification, involving installation of safety devices and computer systems and stationing of specially trained personnel, is an expensive process, *Catholic Action* and *Laine* make clear that proof of nuclear capability alone is not enough to trigger NEPA.

Similarly, the following testimony by Navy Secretary John Lehman fails to constitute a variance from the neither-confirm-nor-deny policy:

"Two years ago we began deploying Tomahawk sea launched cruise missiles equipped with nuclear warheads for theater nuclear deterrence. They are now operationally capable on attack submarines, cruisers, destroyers and reactivated battleships."

Secretary Lehman's statement neither mentions specific ships nor reveals particular information regarding the presence of nuclear weapons at any given time. Again, it only confirms capabilities.

Plaintiffs' further efforts to raise a genuine issue of fact on the question of the existence of a proposal for actual deployment of nuclear weapons by the affidavit of retired Real Admiral Carroll also cannot be sustained. First, as a matter of law, Rear Admiral Carroll's expressed conclusions concerning the likelihood the *Iowa* SAG will in fact carry nuclear weapons are immaterial to the question of whether the Navy itself has disclosed its intentions. Statements by retired officers are unofficial disclosures which cannot result in declassification of otherwise properly classified information. *See, e.g., Afshar, supra*, 702 F.2d at 1133; *Schlesinger v. CIA, supra*, 591 F.Supp. at 68. In any event, Rear Admiral Carroll's affidavit, drawing upon unclassified Navy documents and congressional testimony, again only suggests that the *Iowa* SAG will be capable of carrying nuclear weapons.[13] There has been no

---

**13.** For instance, Rear Admiral Carroll cites testimony by Rear Admiral Roger Bacon, then Director of the Strategic and Theatre Nuclear Division, stating that by 1992 758 nuclear Tomahawks will be deployed on over 148 submarines and surface ships. According to the Navy's unclassified deployment schedule for nuclear To-

mahawks, by 1992 there will be only 148 ships in the U.S. fleet capable of carrying this weapon. While the Admiral concludes from this that the *Iowa* and the *Spruance*-class destroyers will carry nuclear weapons in New York harbor, the two statements do not logically establish that

showing that the Navy has in fact publicly admitted that such will be the case.

In sum, none of plaintiffs' proffered evidence, considered alone or together, establishes an official admission by the Navy that it has a proposal to deploy nuclear weapons at the Staten Island homeport. In fact, since the homeport was first proposed, the Navy is consistently on record as refusing to either admit or deny that any such proposal exists.[14] In the absence of any official, authorized disclosures to the contrary, plaintiffs' contention that the issue has become declassified and subject to disclosure under FOIA must fail.

■■■ Plaintiffs make two additional arguments that warrant only brief comment. First, plaintiffs argue that the information concerning deployment was not properly classified under EO 12356 in the first instance because defendants did not make a specific determination that the disclosure of the presence of nuclear weapons aboard the *Iowa* SAG would damage the national security.[15] In essence, plaintiffs contend that EO 12356 requires the Navy to make individual classification decisions with respect to the presence of nuclear weapons aboard a particular ship, at a particular time and place. Plaintiffs, however, cite no express language in the Executive Order requiring such individualized determination. Nor does the Court find that the Navy's practice of classifying all information concerning the presence of nuclear weapons aboard naval ships to be in conflict with the general prohibition expressed in EO 12356 that information may not be classified unless its disclosure reasonably could be expected to cause damage to the national security. The interest in keeping such information secret is self-evident. Moreover, as the Navy points out, EO 12356 authorizes agencies with original

classification authority to prepare classification guides for facilitating the derivative classification of information which is "in substance the same as information currently classified." *See* EO 12356 §§ 2.1(a), 2.2. Accordingly, application of the neither-confirm-nor-deny policy with respect to the homeport did not constitute improper classification under EO 12356.

Plaintiffs also argue that FOIA Exemption 3 is not applicable because § 2162(d) of the Atomic Energy Act, as described above, removes information concerning the utilization of nuclear weapons from the category of restricted data and entrusts its care solely to the Department of Defense. Whether or not Exemption 3 applies is not dispositive, however, since it is clear that Exemption 1 applies. *See Catholic Action, supra,* 454 U.S. at 138, 102 S.Ct. at 200. In all events, notwithstanding the provisions of § 2162(d), the Atomic Energy Act provides independent authority for classifying information concerning the utilization of nuclear weapons. According to plaintiffs, the sole authority for classifying such information is EO 12356. The Joint DOE/DOD classification guide, however, clearly states that the information is considered classified under both EO 12356 and the Atomic Energy Act. Moreover, EO 12356 expressly states: "Nothing in this Order shall supersede any requirement made by or under the Atomic Energy Act."

■■■ Plaintiffs seek to avoid summary judgment by requesting time to conduct additional discovery pursuant to Rule 56(f). That rule is intended to ensure that parties defending a motion for summary judgment have been afforded a reasonable opportunity to uncover material facts before judgment is taken against them. *Skandinaviska Enskilda Banken v. Rathaus,* 624

---

any given ship will be nuclear equipped at any given time or location.

**14.** For example, in August 1984, Congressman Weiss and ten other members of the New York delegation formally requested the Secretary of the Navy to vary the neither-confirm-nor-deny policy with regard to the homeport. In a letter dated October 2, 1984, the Secretary formally declined to do so.

**15.** Plaintiffs base this claim on deposition testimony by Captain William D. Hahn. While the Court finds Captain Hahn's testimony somewhat equivocal on the question of whether or not a specific determination was made in this case, the Navy has not disputed this claim on these motions.

F.Supp. 207, 209 (S.D.N.Y.1985). Rule 56(f), however, cannot be used to forestall entry of summary judgment "without a showing that the material sought is germane to the defense." *Contemporary Mission, Inc. v. U.S. Postal Service,* 648 F.2d 97, 107 (2d Cir.1981). Thus, to prevail on a request for additional discovery time, the opponent of a motion for summary judgment must file an affidavit explaining (1) the nature of the incompleted discovery, i.e., what facts are sought and how they are obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what efforts the affiant has made to obtain those facts, and (4) why those efforts were unsuccessful. *Burlington Coat Factory Warehouse v. Esprit de Corp.,* 769 F.2d 919, 926 (2d Cir.1985).

In an effort to meet these requirements, plaintiffs have submitted an affidavit stating they intend to seek discovery "from defendants, from past and present state, local and regional officials, and from other third-party witnesses who have had communications with the Navy and [congressional] representatives about the New York homeport." The purpose of such discovery, plaintiffs state, will be to reveal facts showing that the Navy had disclosed its proposal to deploy nuclear weapons at the homeport in unclassified statements. Plaintiffs also hope to uncover facts confirming their interpretation of the congressional testimony of Navy officials described above.

 However, as discussed above, only authorized and official disclosures can result in declassification. Thus, even if plaintiffs were able to obtain evidence that an unauthorized "leak" had in fact occurred, these statements could not, as a matter of law, result in declassification of the existence of a Navy proposal to deploy nuclear weapons at the homeport. Such unauthorized disclosures do not require either declassification or disclosure under FOIA since confirmation or denial that such disclosures are accurate can often cause harm beyond that caused by the leak itself.[16] *See Nuclear Control Institute v. U.S. Nuclear Regulatory Commission, supra,* 563 F.Supp. at 771; *Murphy v. FBI, supra,* 490 F.Supp. at 1141–42; *Safeway Stores, Inc. v. FTC, supra,* 428 F.Supp. at 347. Moreover, EO 12356 § 1.3(d) explicitly states: "Information classified in accordance with [this section] shall not be declassified automatically as a result of any unofficial publication or inadvertent or unauthorized disclosure in the United States or abroad of identical or similar information." *See also* OPNAV Instruction 5721.1D, *supra.*

*Schlesinger v. CIA, supra,* 591 F.Supp. 60, is relevant to plaintiffs' claim. There, plaintiff sought information concerning CIA involvement in the 1954 coup in Guatemala. Pursuant to a Rule 56(f) affidavit, plaintiff claimed that further discovery was necessary to determine the extent of prior CIA disclosures of the United States' involvement in order to determine whether the agency should be precluded from invoking FOIA Exemption 1 or 3. The court denied the request, finding that statements in books by former CIA officials (even when cleared by the CIA) and general discussions in congressional publications do not constitute official disclosures, and, therefore, any dispute about the extent of such disclosures was immaterial to plaintiff's defense. *Id.* at 66. Similarly, plaintiffs' anticipated efforts to uncover leaks to congressmen[17] and state and local officials by definition cannot uncover any material evidence concerning their defense to the present motion.[18] Accordingly, plaintiffs' request for additional discovery is denied.

---

**16.** It has been noted before that relying on limited disclosures to declassify information would discourage agencies from disclosing as much information as possible without compromising national security interests. *See Afshar, supra* 702 F.2d at 1131; *Salisbury v. United States,* 690 F.2d 966, 971 (D.C.Cir.1982).

**17.** To the extent any disclosures of classified information were made to congressmen with appropriate security clearances, such disclosures would of course also fail to result in declassification. *See Moon v. CIA,* 514 F.Supp. 836, 840–41 (S.D.N.Y.1981).

**18.** Defendants also seek to prevent further discovery based upon a written stipulation between

## South Beach Housing

As discussed above, the FSEIS and the ROD of August 20, 1986, state that the Navy intends to build housing for homeport personnel on the 110 acre site at South Beach, Staten Island. After the close of the public comment period but prior to publication of the FSEIS, it became known that freshwater wetlands qualifying for both state and federal protection exist on approximately ⅓ of the site. The Navy states that it is in the process of revising its final plans and that it is committed not to construct any housing units within 100 feet of the designated wetlands. Plaintiffs contend that the Navy should be ordered to supplement the FSEIS to provide a full discussion of the project's effects on the wetlands and to allow for public comment. The Navy responds that it prepared the DSEIS and FSEIS in light of its commitment to build outside the 100–foot curtilage created by ECL § 24–0701.2.

It is now well settled that the proper scope of review in NEPA actions is limited to review of the executive agency's compliance with the "essentially procedural" requirements of the Act. *Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (1980), *quoting Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). Once it is determined that an agency's balancing of substantive environmental issues has been made subject to NEPA's procedural requirements, "[t]he only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.'" *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576 (1976), *quoting Natural Resources Defense Council, Inc. v. Morton,* 458 F.2d 827, 838 (D.C.Cir.1972).

In evaluating the sufficiency of an EIS, "the court's task is merely 'to determine whether the EIS was compiled in objective good faith and whether the resulting statement would permit a decisionmaker to fully consider and balance the environmental factors.'" *Sierra Club v. United States Army Corps of Engineers,* 701 F.2d 1011, 1030 (2d Cir.1983), *quoting County of Suffolk v. Secretary of the Interior,* 562 F.2d 1368, 1383 (2d Cir.1977). Thus, a court "may not rule an EIS inadequate if the agency has made an adequate compilation of relevant information, has analyzed it reasonably, has not ignored pertinent data, and has made disclosures to the public." *Id.* at 1029.

■ While the adequacy of the FSEIS is not really in issue—it does not contain any discussion of the impact on wetlands—the Navy's good faith in preparing the DSEIS and FSEIS must first be considered since it bears upon the appropriate relief required by NEPA. Notwithstanding plaintiffs' accusations, the uncontradicted evidence shows that the Navy was not made aware of the presence of designated wetlands until the Navy had at least begun final typing of the FSEIS. Prior to March 13, 1986, when the Navy received the letter from the DEC informing it of the presence of designated wetlands, the official DEC Map relied upon by the Navy did not indicate the presence of any designated wetlands at the South Beach site. Moreover, the National Wetland Inventory Map and the Navy's own field inspection only revealed the presence of a small pocket of approximately 10 acres of wetlands in the southwest corner of the plot. While the Navy might be faulted for failing at least to acknowledge the presence of these known wetlands in the DSEIS and FSEIS, the Court cannot conclude that the environmental studies were prepared without objective good faith in an effort to "sweep under the rug" difficult environmental issues.

the parties that no discovery on the nuclear issue would be conducted until the Court ruled on defendants' motion for partial summary judgment. A fair reading of the stipulation, however, indicates that it was not intended to preclude discovery pursuant to Rule 56(f), and, accordingly, the Court does not rest its decision on these grounds.

 The Navy's apparent good faith, however, does not excuse it from its obligation to supplement an EIS in appropriate circumstances.[19] The Council on Environmental Quality regulations require an agency to prepare a supplement to either a DSEIS or FSEIS if "(i) the agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c). While NEPA itself does not provide for supplemental impact statements, these regulations have been upheld as implementing NEPA's general goal of requiring the federal government to assume "continuing responsibility" for promoting environmental values. *See* 42 U.S.C. § 4331(b); *People Against Nuclear Energy v. United States Regulatory Commission*, 678 F.2d 222, 233 (D.C.Cir.1982).

 Like the decision whether an EIS is required in the first place, the responsibility for determining whether new information is so "significant" as to require an SEIS lies with the agency proposing the action. *Sierra Club, supra*, 701 F.2d at 1037. In addition, an agency's decision not to supplement an EIS will be evaluated under the same standard applied to a decision not to issue an EIS. *Cuomo v. United States Nuclear Regulatory Commission*, 772 F.2d 972, 975 (D.C.Cir.1985); *see Sierra Club, supra*, 701 F.2d at 1037. The standard in this Circuit is whether the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Administrative Procedure Act, 5 U.S.C. § 706(2)(A); *Town of Orangetown v. Gorsuch*, 718 F.2d 29, 35 (2d Cir.1983). Thus, the Court of Appeals for this Circuit has held that, in the absence of a finding of bad faith in connection with the preparation of an im-

pact statement, a court must defer to the agency the threshhold question of whether new information requires an SEIS. *Sierra Club, supra*, 701 F.2d at 1037. However, even in the absence of bad faith, a court may order the responsible agency to conduct an analysis of newly received information and to evaluate it in light of the proposed action. *Id.*

In opposition to the present motion, the Navy initially stated that it was "committed" to not building on any designated wetlands, but that it had not yet reached a decision on whether the newly discovered environmental information would require supplementation of the FSEIS. Subsequent to oral argument, the Navy has since refined its position to the point where it now promises not to build any structure within 100 feet of the designated wetlands. According to the Navy, so long as it avoids building or other construction activities defined in § 24–0701.2 within a 100–foot buffer zone, New York law does not require prior approval of the DEC. From this conclusion, the Navy argues that NEPA does not require supplementation of the FSEIS to consider the impact of this construction on the wetlands.

 40 C.F.R. § 1502.9(c) does not mandate a formal supplemental EIS or a formal document explaining why the agency believes supplementation is unnecessary every time new information comes to light. *See Friends of the River v. FERC*, 720 F.2d 93, 109 (D.C.Cir.1983). However, the sensitivity of the new information, coupled with the Navy's response to date, convinces the Court that some formal documentation of the basis for the Navy's ultimate decision is necessary here.

One-third of the proposed site is covered by freshwater wetlands entitled to both state and federal protection. The environmental significance and sensitivity of these wetlands cannot be disputed. *See* New

---

19. Contrary to the Navy's suggestion, the fact that the Navy was not made aware of the presence of wetlands until after the public comment period had expired also cannot excuse its obligation to address the wetlands issue. The primary and nondelegable responsibility to consider the significant environmental impact of a

proposed action lies with the agency. This is simply not an instance of plaintiffs using litigation in place of a public comment period. *See Vermont Yankee, supra*, 435 U.S. at 553–54, 98 S.Ct. at 1216–17; *County of Suffolk, supra*, 562 F.2d at 1385.

York State Environmental Conservation Law § 24–0105(1). Furthermore, contrary to the Navy's assertions, it is not clear that a unilateral understanding not to build within 100 feet of any wetlands is sufficient to remove the project from the jurisdiction of the DEC. First, although the Navy's brief refers to building and "other activities" within the statutory buffer zone, its supporting affidavit only promises not to build "any structures on land which is within 100 feet of the wetlands." Vasikik Affidavit, ¶ 5. It is clear, however, that § 24–0701.2 regulates building and construction related activities within the buffer zone. Second, and more importantly, § 24–0701.2 authorizes the DEC to extend the regulated area where necessary to protect and preserve the wetland. Pursuant to 6 NYCRR §§ 663.2 and 664.7, the boarder area may be extended as much as an additional 100 feet.

In any event, the Navy has provided no authority to support its assertion that promising to build outside a 100–foot perimeter satisfies its obligations under NEPA. To date, there is no indication that the Navy has developed anything near to a final plan for the site. Indeed, the number of proposed units has fluctuated from 1,150 in March 1986, to 800 in August 1986, and now appears to stand at approximately 1,000. In light of this prior history, an assurance that the final site plan will not call for any structure within 100 feet of any wetlands is not a sufficient guarantee against adverse impact or an adequate basis for determining that reasonable consideration has been given to the environmental impact of the proposed action.

Accordingly, to assure that NEPA's procedural requirements have been satisfied, the Navy is directed to provide the Court with documentation supporting its decision that supplementation is not necessary in this case. The adequacy of that documentation will then be evaluated under the appropriate standards. *See Town of Orangetown, supra,* 718 F.2d at 35.

Since no construction is yet underway at any of the homeport sites, there is no occasion to determine whether postponement of construction on other aspects of the project is required. However, in light of the fact that an application for a dredge and fill permit is now pending, the Navy should conduct its analysis and report its determination to the Court promptly. In addition, if the Navy takes the view that construction on the pier area may proceed regardless of any determination on the housing issue, then it should inform the Court of this and the reasons for its position.

For the reasons stated above, defendants' motion for partial summary judgment is granted.

The Clerk is directed to mail a copy of the within to all parties.

SO ORDERED.