In the Matter of SHIRA FLAX et al., Petitioners, v CAROL ASH, as Regional Director of the New York State Department of Environmental Conservation, et al., Respondents.

Supreme Court, New York County, November 10, 1988

### APPEARANCES OF COUNSEL

*Jacob D. Fuchsberg Law Firm (James Lane* of counsel), for petitioners. *Robert Abrams, Attorney-General (John G. Proudfit* of counsel), for respondents. *Cawse & Birmingham* for intervenor-respondent.

### OPINION OF THE COURT

EDWARD J. GREENFIELD, J.

This CPLR article 78 proceeding seeks a judgment vacating the contingent grant by the respondent officials of the New York State Department of Environmental Conservation (DEC)

to the United States Navy of a water quality certificate, which enabled the Navy to proceed with its plans for the construction of a homeport base and facilities on Staten Island for a battleship surface action group, and a preliminary injunction to compel revocation of the water quality certification which led to permission to commence dredging.

The court on this application is not called upon to make any determinations as to the wisdom or soundness of the policy decision by Congress to locate the homeport on Staten Island, and expresses no such opinions. There is nothing before the court which touches in any way on the much bruited problems of nuclear safety. That was dealt with by the United States District Court for the Eastern District of New York in *Hudson Riv. Sloop Clearwater v Department of Navy* (659 F Supp 674 [1987], *affd* 836 F2d 760). The court does have to determine if the administrative finding that there has been compliance with the applicable State environmental conservation laws is to be sustained. Even though homeport is part of a national project, there is no claim here asserted to Federal supremacy, and the project has to measure up to State as well as Federal environmental standards before it can proceed.

Petitioners, private citizens and environmental activists, challenge the determination by the DEC granting a water quality permit, on the grounds that the DEC failed to consider every aspect of an interdependent homeport plan, but improperly took a provisional and narrow view of only part of the project. Respondents are the regional director, and the regional permit administrator, respectively, of the DEC. Leave to intervene was granted to Congressman Guy V. Molinari upon oral argument. Congressman Ted Weiss has submitted an affirmation in support of the petitioners, but has not sought leave to intervene. The question raised by petitioners really relates to whether a large multiphase operation spread over many years and multiple locations can be permitted to go forward unless each and every aspect of the plan is in place and receives total approval at the outset.

In order to accommodate the battleship surface action group, the Navy plan calls for dredging of a bulkhead site, and fill to accommodate the U. S. S. *Iowa* and other warships at the Stapleton waterfront. On 40 acres of adjacent uplands would be base facilities for repair and maintenance, storage and operations. At Fort Wadsworth, the plans call for additional warehousing and storage space, and administrative, medical, recreational and retail facilities. Five hundred units

of housing would also be provided for support military personnel. At South Beach, there would be family housing for military personnel of approximately 800 to 1,000 units. Although it is anticipated that approximately 4,500 military personnel and 1,000 civilians will be stationed and work at the homeport, the balance of the housing needs were expected to be satisfied within the existing private market.

The homeport project, like other military construction projects, is reviewed and appropriations provided on an annual basis, for each successive fiscal year. In fiscal year 1986 the Navy proceeded with project design, and applied to the DEC for a water quality certification under section 401 (a) (1) of the Clean Water Act (codified at 33 USC § 1341 [a] [1]), which requires that any applicant for a Federal permit which may result in any discharge into navigable waters must obtain a waiver or certification from the appropriate State agency before the project may proceed. That means that in the instant case, the Navy had to obtain a certificate from the New York State DEC before it could get a permit from the United States Army Corps of Engineers to perform dredging and filling work (33 USC § 1344).

The Navy originally prepared a draft environmental impact statement, and a final environmental impact statement. However, when they decided to expand the available housing and provide additional units at South Beach, a supplemental final environmental impact statement was filed. In February 1986, DEC voiced its objection to the Navy plans on the ground that one third of the South Beach site impacted on State-regulated freshwater wetlands. The United States Army Corps of Engineers notified the Navy that because of the wetlands problem, work could proceed at the South Beach site only after the issuance of a section 401 permit, and called for a public hearing. However, the Navy recognized that its original plans for South Beach would affect a wetlands area, and revised its plans, proposing to build the projected housing units on the upland and nonwetland portions of the South Beach site, at least 100 feet away from the nearest designated wetlands.

On August 26, 1986 the DEC issued findings pursuant to the State Environmental Quality Review Act (SEQRA), and approved issuance of the section 401 water quality certification "contingent upon the applicant * * * requesting and obtaining all permits, certifications, approvals or authorizations for all stages, phases, and/or locations * * * as may be required by federal or state law".

Petitioners contend that the section 401 certification issued upon these conditions is unlawful, and that the DEC failed to make findings as required by SEQRA, supported by substantial evidence, concerning the adverse environmental impact of the housing to be constructed at South Beach upon abutting wetlands. There are three challenges to the action taken: (1) that "piecemeal review" is unlawful and that a comprehensive view of the entire project is required; (2) that there can be no "geographical segmentation" to approve construction at Stapleton until there have been appropriate findings for South Beach; and (3) that the formal findings required by SEQRA require consideration of the environmental impact on freshwater and tidal wetlands both at Stapleton and at South Beach.

In conjunction with the article 78 review, petitioners also seek a preliminary injunction to suspend the water quality certification until final judgment in this proceeding, thus halting further construction.

### PIECEMEAL REVIEW

Decision-making procedures for the DEC are governed by article 70 of the Environmental Conservation Law (ECL 70-0103 [5]), which provides: "It is the intent of the legislature that, to the maximum extent feasible, a comprehensive project review approach shall replace separate and individual permit application reviews." ECL 70-0107 (1) requires the DEC to promulgate rules and regulations to assure the efficient and expeditious administration of the article. Those procedural provisions are set forth in part 621 of title 6 of the New York Codes, Rules and Regulations. It is specified therein that: "If a project requires more than one department permit, the applicant must simultaneously submit all the necessary applications, or demonstrate to the department's satisfaction that there is good cause not to do so." (6 NYCRR 621.3 [a] [3]; 621.4 [d] [1].) It is an indisputable fact that for the homeport project to move ahead, numerous applications and permits were required, and that the Navy had not submitted all its applications for all phases of the project at one time. Petitioners contend that this is a violation of law on its face, but the DEC and the Navy urge that the project comes under the saving exception to the rule of simultaneous submission.

In an article 78 review, the court of course must sustain an administrative determination unless it is not in accordance with law, or is arbitrary or capricious. What the court must

determine is whether the action taken by the DEC, and its construction of the applicable law, was unreasonable or irrational. *(Matter of Howard v Wyman,* 28 NY2d 434, 438.) While the procedural requirements for a section 401 water certification which are spelled out in 6 NYCRR 621.4 (d) (1) do not explicitly contain a good cause exception, such an exception is incorporated by reference to compliance with 6 NYCRR 621.3, which does so provide. The requirement of completeness can be waived for good cause, and the DEC having found that such good cause exists, the argument that "piecemeal review" is prohibited must fall.

The claim by petitioners that even if the DEC believed good cause to exist they still had to have a public hearing and make formal findings to that effect is founded on a misinterpretation of the law. Public hearings with a record and findings of fact are required for adjudicatory proceedings (State Administrative Procedure Act § 302), but the certification challenged here was the result of administrative evaluation, and the DEC had the authority to "determine whether or not to conduct a public hearing". (ECL 70-0119 [1]; *Matter of Town of Fenton v New York State Dept. of Envtl. Conservation,* 117 AD2d 920, 922.) Notice of the complete application was in fact published in the New York Times, the Staten Island Advance and the Environmental News Bulletin, but nothing was then done by the petitioners given the opportunity to comment. Insofar as formal findings are concerned, the DEC did set forth its findings in connection with the section 401 water certification dealing extensively with the operations at Stapleton, but once the Navy made it plain it was not going to build in the wetlands area at South Beach, no explicit findings were called for as to nonimpacting sites.

The DEC's explanation as to permitting a "good cause" exception to the requirement of simultaneous submission of all applications for permits is reasonable, and neither arbitrary nor capricious. In a project of the magnitude of the homeport project, the DEC was fully aware that the project would have to proceed in planned phases, that annual funding would be required by Congress, which could substantially alter the nature and scope of the project, and that various phases of the work would be performed by contractors or public agencies who would prepare detailed plans at future dates. This is quite unlike a project by a private developer, who would have all his financing and his plans in place before embarking on a project. Thus, there was ample basis for determining that good

cause existed to permit a water certification to issue, and to permit dredging operations to proceed at Stapleton, with the recognition that future applications would be required, and all further stages would have to comply with legal and environmental requirements, including those governing freshwater wetlands under ECL article 24.

GEOGRAPHICAL SEGMENTATION

Petitioners contend that the failure by the DEC to make specific findings as to South Beach while giving approval to water certification so that the Stapleton phase could go ahead, improperly split the separate components of the homeport project into separate elements for review, instead of considering the entire project as a unit. ECL 70-0103 (5) does call for comprehensive project review, but only "to the maximum extent feasible".

In issuing its certification, the DEC was required to comply with the provisions of the State Environmental Quality Review Act. Thus, it had to evaluate the environmental impact statements which were submitted, which did not cover the wetlands at South Beach. However, with the Navy's statement that it would not construct housing in the wetlands area, and that the housing developer who would promulgate specific plans would comply with all the requirements of the ECL, it was not unreasonable for the DEC to conclude that there was no issue presently presented which required review of the impact on the wetlands issue, and there was no improper segmentation.

The United States Circuit Court of Appeals, passing on Federal environmental requirements of the homeport project in *Hudson Riv. Sloop Clearwater v Department of Navy* (836 F2d 760 [1988], *supra),* differed with the conclusion of the lower court that the housing and the rest of the homeport concept were inextricably interconnected. Since it was concluded that even if the Navy were unable to provide any family housing at South Beach, military necessity would require it to proceed with the rest of the project, the housing and operational aspects of the homeport could not be deemed "connected". *(Supra,* at 763.) Since the proper test of interdependence is independent utility *(Fritiofson v Alexander,* 772 F2d 1225, 1242 [1985]), the fact that the operational aspect of the homeport would proceed with or without the housing made it clear that the two parts of the project were indepen-

dent, rather than connected actions, and need not be consid-ered together in a single environmental impact statement. The court noted *(supra,* at 764, n 1), and we agree, that even though the rest of the homeport project proceeds, "it will still be possible to consider [in the future] and ameliorate any environmental delinquencies related to the housing aspects of the project."

The DEC did and could reserve environmental review for the housing proposal to such time as site-specific issues and the scope of the project could be reasonably ascertained. "[A]n EIS is required to furnish only such information as appears to be reasonably necessary under the circumstances for evalua-tion of the project rather than to be so all-encompassing in scope that the task of preparing it would become either fruitless or well nigh impossible". *(Natural Resources Defense Council v Callaway,* 524 F2d 79, 88.) It was not unreasonable to give the green light to dredging for the Stapleton port facilities while deferring consideration of the South Beach housing to a time when site plans were presented and the environmental impact could be more accurately measured. Rome was not built in a day. If its builders had to submit simultaneous applications and avoid geographical segmenta-tion, it never would have been built.

### LACK OF FORMAL FINDINGS

The contention that the DEC failed to make formal findings as to the possible adverse impact of the South Beach housing in its SEQRA rulings is part and parcel of the previous objections as to simultaneity and segmentation. The DEC did not find that the housing would have no adverse impact on the wetlands. Rather, it determined that since it did not yet have specifics on the plans of the Navy for the South Beach housing (or the Urban Development Corporation which would build according to specifications and then lease back), it need not pass on the issue before issuing a water certification for Stapleton. The responsibility for determining whether given information is of such significance as to require supplementing the environmental impact statement lies with the agency proposing the action. *(Sierra Club v United States Army Corps of Engrs.,* 701 F2d 1011, 1037.) The permit required by the Freshwater Wetlands Act will have to be forthcoming, by the landowner (the State) which will lease the facilities for use by Navy personnel, or by the builder chosen to erect housing on

the site. When the application for permits for the housing is made, the DEC will then make all the necessary findings as to the impact of drainage and run-offs, and human incursion on the ecological system. But since the Navy, if a lessee on the site, will not necessarily be applying for the permit, the DEC could reasonably say (without formal findings) "not now".

The DEC, in granting the water certification and passing on water quality standards, was limited to the specific questions presented on that application, and was not required to pass on other related issues. *(Matter of De Rham v Diamond,* 32 NY2d 34, 45.) "In acting on an application for State section 401 certification * * * the Commissioner of Environmental Conservation is limited to determining whether applicable water quality standards will be met and is not empowered to base his decision on a balancing of need for the project against adverse environmental impact." *(Matter of Power Auth. v Williams,* 60 NY2d 315, 320.)

While under the Federal standards (NEPA), the administrative agency is required to consider environmental impacts, under SEQRA it must "minimize or avoid" adverse environmental effects. (ECL 8-0109 [1]; 6 NYCRR 617.9 [c] [2].) This does not mean, however, that findings to that effect must be made before explicit plans are presented for the South Beach site.

Subsequent to the issuance of the section 401 water certification, the Navy applied for and received permits for dredging and excavation at Stapleton under the Protection of Waters Act (ECL art 15, tit 5) and Tidal Wetlands Act (ECL art 25). The article 15 permit was challenged in the Supreme Court, Queens County, in *Bostrom v Ash* (index No. 10749/87). The petitioners in that proceeding asserted, *inter alia,* objections to the DEC action virtually identical with those raised here—to wit, that the Navy had failed to submit all its permit requests simultaneously; that the DEC confined its review to dredging and pier construction instead of a review of the project in its entirety, thus constituting improper segmentation and that the SEQRA findings were incomplete.

The court, per Corrado, J., in an opinion dated November 30, 1987, found that good cause existed for treating the Navy's application in separate stages and that the basis for applying the good cause exception need not have been spelled out in writing, since it involved only an intermediate step in the administrative process and not a final adjudication. It dis-

missed the claims of geographical segmentation and held that the failure of the DEC to consider the issue of the impact of housing on the freshwater wetlands of South Beach in its SEQRA findings was proper, since the Navy's decision not to construct near the wetlands rendered the issue moot. The court declined to pass on whether a freshwater wetlands permit would be required for the South Beach construction on the grounds that issue was to be determined by this court. In short, that court, in passing on the dredging permits, reached conclusions similar to those of this court in passing on the water certification certificate and refused to annul the permit granted by DEC and dismissed the petition.

This court, for the reasons above stated, concurs with the reasoning in *Bostrom v Ash (supra),* and finds that on the facts as presented in the petition and the answer, as amplified by the documents submitted in connection therewith, there is no basis for the allegations of the petition that the DEC acted arbitrarily, unreasonably, or contrary to law. The motion for preliminary injunction is denied, and the petition is dismissed.